1   EUGENE G. IREDALE, ESQ. (SBN: 75292)
    JULIA YOO, ESQ. (SBN: 231163)
2   LAW OFFICES OF EUGENE G. IREDALE
    105 West "F" Street, 4th Floor
3   San Diego, California  92101-6036
    TEL: (619) 233-1525  FAX: (619) 233-3221
4
    Attorneys for Plaintiffs ESTATE OF ALAN KOSAKOFF, *by its personal representative* HAROLD
5   KOSAKOFF, ARLENE KOSAKOFF, *an individual*, HAROLD KOSAKOFF, *an individual*

6

7                        UNITED STATES DISTRICT COURT
8
                IN AND FOR THE SOUTHERN DISTRICT OF CALIFORNIA
9
                           (Hon. Irma E. Gonzalez)
10
    ESTATE OF ALAN KOSAKOFF, by its      )   CASE NO.:  **08-CV-1819-IEG-NLS**
11  personal representative HAROLD KOSAKOFF, )
    ARLENE KOSAKOFF, an individual, HAROLD )  **PLAINTIFFS' RESPONSE IN**
12  KOSAKOFF, an individual,             )   **OPPOSITION TO DEFENDANTS'**
                                         )   **MOTION FOR SUMMARY**
13              Plaintiffs,              )   **JUDGMENT**
                                         )
14      v.                               )   Date:    April 26th, 2010
                                         )   Time:   10:30 a.m.
15  CITY OF SAN DIEGO, a municipal corporation, )
    SAN DIEGO POLICE DEPARTMENT,         )
16  WILLIAM LANDSDOWNE, an individual,   )
    Officer Gottfried, an individual, Officer Lenahan, )
17  an individual, Officer Douglas, an individual, )
    and DOES 1-100 inclusive,            )
18                                       )
                Defendants.              )
19                                       )
                                         )
20                                       )
                                         )
21  _____ )

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES................................................................... ii

I.   INTRODUCTION................................................................ 1

II.  FACTS OF THE CASE ......................................................... 2

     A.  Statement of Sean Seaman........................................ 2

     B.  Statement of Greg Mathy......................................... 3

     C.  Gottfried's Deposition.............................................. 3

     D.  Physical Evidence.................................................... 5


       1.  Shattered Glass                                   5

       2.  Angles of the Shots and Location of Casings       6

       3.  Douglas' Shots                                    6

III.  Defendants' Credibility is a Factual Issue in Dispute..................... 7

     A. Lenahan's Version of Events is not Possible ............... 10

     B. Douglas' Version of Events is not Possible ................ 11

IV.   Defendant's Conduct was Below the Standard of Care and  Objectively
     Unreasonable................................................................ 12

V.    Defendants are Not Entitled to Summary  Judgment on the Fourth
     Amendment Claim ....................................................... 13

VI.   Plaintiffs Object to the Consideration of the Declaration of William
     Lewinski  re Motion for Summary Judgment and Moves to Strike It as
     Inadmissible................................................................. 15

VII.  Summary Judgment on the Fourteenth Amendment Claim is
     Inappropriate................................................................ 16

VIII. Summary Judgment on the State Causes of Action is Inappropriate............... 18

IX.   Motions to Dismiss ....................................................... 19

X.    Conclusion................................................................. 19

i

# TABLE OF AUTHORITIES

## Cases  Page(s)

Bryd  v. Guess 137 F. 3d 1126, 1134 (9th Cir. 1998)...............................................  16

Celotex Corp v. Catrett, 477 U.S. 317 (1986).........................................................  13

Tennessee v. Garner, 471 U.S. 1 (1985).................................................................  13, 14, 15,

17

Vera Cruz v. City of Escondido, 139 F.3d 659 (9th Cir. 1998).............................  14

Fikes v. Cleghorn, 47 F.3d 1011 (9th Cir. 1995).....................................................  14

Graham v. Connor, 490 U.S. 386 (1989)..................................................................  13, 16, 19

Ting v. United States, 927 F.2d 1504 (9th Cir. 1991)..............................................  15

Curnow By and Through Curnow v. Ridgecrest Police, (9th Cir. 1991) 952 F.2d

321, 325. ...............................................................................................................  16

Strandberg v. City of Helena, 791 F.2d 744, 748 (9th Cir.1986) ...........................  16

Kelson v. City of Springfield, 767 F.2d 651, 653-55 (9th Cir.1985) ......................  16

Smith v. City of Fontana, 818 F.2d 1411, 1419 (9th Cir.), *cert. denied,* 484 U.S.

935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987)...............................................................  16

Ramirez v. County of San Diego, 2009 U.S. Dist. LEXIS 32363 (S.D. Cal. Apr.

15, 2009) ...............................................................................................................  17

Bingue v. Prunchak, 512 F.3d 1169, 1177 (9th Cir. 2008)....................................  17

Tubar v. Clift, 453 F. Supp. 2d 1252, 1258 (W.D. Wash. 2006)(emphasis added).  14

Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579 (1993)....................  15

Brosseau v. Haugen, 543 U.S. 194, 125 S. Ct. 596 (2004)....................................  14

Anderson v. Creighton, 483 U.S. 635 (1987)...........................................................  14

Santos v. Gates, 287 F.3d 846, 853 (9th Cir.2002).................................................  13, 18, 19

Liston v. County of Riverside, 120 F.3d 965, 976 n. 10 (9th Cir.1997) (as

amended) ...............................................................................................................  13, 19

Porter, 546 F.3d at 1141 (quoting Lewis, 523 U.S. at 850)....................................  17

Prinzi v. Keydril Co. (5th Cir. 1984) 738 F2d 707.................................................  19

Smith v. Fontana 818 F. 2d 1411 (9th Cir. 1987) ....................................................  16

Anderson v. Liberty Lobby, Inc. (1986) 477 US 242, 255.....................................  19

**I.**

**INTRODUCTION**

In this action, Defendant San Diego Police Officers Lenahan and Douglas shot and killed Alan Kosakoff. The decedent, Alan Kosakoff, had been a brilliant student who was also diagnosed with schizoaffective disorder during his first year at University of California Berkeley. Alan had previously been hospitalized for psychiatric reasons. He had been gravely mentally disabled for several years as of the time of his death.

According to Defendant Gottfried, Alan Kosakoff ran a red light and he attempted to stop Alan. Alan did not pull over and a pursuit ensued. Alan drove by his mother's house with the police chasing him the first time but did not stop. Instead, Alan got on the freeway and a high speed pursuit ensued. After several minutes, a supervisor called off this pursuit. The police cars turned off their lights and sirens, and in response, Alan drove carefully and within the speed limit.

Several minutes later, Alan again drove to his mother's house at 14122 Half Moon Bay Drive, this time driving slowly and within the speed limit. Using his remote control, Alan opened the garage and drove into it. Defendant officers parked their patrol cars on the street instead of blocking the driveway to the garage. Defendants ran up the driveway into the garage and attempted to pull Alan out of the car. Alan Kosakoff put the car into reverse and slowly backed out of the garage. The car was out of the garage and in the driveway when defendants shot at Alan multiple times, wounding him in the right leg and in the head. Alan died thirty-nine days later from his wounds.

Other defendants include the Chief of Police, William Landsdowne, and the San Diego Police Department. The first cause of action is by Arlene and Harold Kosakoff for violation of the right of familial association under 42 U.S.C. §1983; the second for wrongful death under 42 U.S.C. §1983; the third for the use of excessive force under 42 U.S.C. §1983, the fourth is a *Monell* claim based upon the failure to properly screen, hire, train, supervise and discipline; the fifth for wrongful death under California state statute; the sixth cause of action is a state law claim for battery; the seventh cause of action is a state law claim for intentional infliction of emotional distress; and eighth is a state law claim for negligence.

1

Defendants seek summary judgment based on declarations of the defendants that contradict their own deposition testimony and the physical evidence at the scene of the shooting. Given the inconsistent statements among the defendants themselves and differing eye witness accounts, summary judgment is entirely unwarranted. Based on the evidence, a reasonable jury could find the police officer defendants rushed into the garage without the necessity to do so; that they engaged in tactics that no reasonable police officer would employ; that they used fatal force by firing their weapons when there was no danger of death or serious bodily injury; and that they acted out of anger in killing the decedent.

## II.
## FACTS OF THE CASE

Testimony of the defendant officers contradict each other, their declarations and the physical evidence. Lenahan and Douglas both assert that decedent's car was inside the garage at the time they fired their guns. The physical evidence shows that their claims are false. Their claims are contradicted by independent eye witnesses.

Evidence disproves Defendants' assertion that this was a fast-moving, life threatening, dangerous situation. While initially there was a high speed chase, after the chase was officially called off by a supervisor and the officers turned off their siren and lights, Alan Kosakoff slowed his car down. He was driving below the speed limit and obeying traffic laws as he drove back to his mother's house. Defendants were ordered to stop giving chase so that they would not create a dangerous situation. Nevertheless, defendants continued to follow Alan Kosakoff for miles, acted precipitously and violently and in doing so, caused the death of an unarmed, mentally ill man who had pulled into his mother's garage.

### A. Statement of Sean Seaman

Sean Seaman, a neighbor of Arlene Kosakoff who did not know Alan, saw Alan drive back through the neighborhood at about 10mph, going around the corner. (Ex. A, Seaman statement, p. 2) He saw the car pull into the garage. Alan was obeying the traffic laws. "The next thing I know a few seconds later, the vehicle started backing up. There was no screeching of tires, it was not a very rapid movement... At that point, I began to hear shots fired when the vehicle was in the driveway as it was

2

backing up looking to start going again to start driving down the street. It looked like the back bumper, when the initial shots were fired and nearing the end of the driveway to enter the street." *(Id.)* "It did not appear there were any officers directly behind the vehicle. They seemed to be on the side of the vehicle or in front of the vehicle when it was backing up." (*Id.* at p. 3) Seaman stated that either one or two of the officers were in the garage and the third officer was on the side of the yard near where the grass meets the driveway when the shots were fired. (*Id.* at pp. 5-6) "When they first started firing the shots he was just approaching the street and so the bumper of the car was right at where the sidewalk meets the asphalt." (*Id.* at p. 6)

### B. Statement of Gregory Mathy

Greg Mathy, a neighbor, also did not know Alan Kosakoff. Mathy saw the cars traveling slowly, "they were just driving normal, had normal regulation speed." (Ex. B, Mathy statement, p. 2). Mathy stated that he was able to see the vehicles clearly. (*Id.* at p. 3) Mathy witnessed the shooting occurring "while the vehicle was on the driveway." (*Id.*)

### C. Gottfried's Deposition Testimony

Gottried knew that the Corolla was registered to a person who lived at 14122 Half Moon Bay Drive, the location where Alan pulled into the garage. (Ex. C, Gottfried depo. p. 22, ll. 19-25) After Alan slowed down, Gottfried followed him to an exit at Del Mar Heights Road. Alan turned left and Gottfried followed by turning left. (*Id.* at p. 25, ll. 3-7) Alan then turned on Boquita and Gottfried followed. (*Id.* at p. 22, ll. 14-19) Gottfried then saw Alan come to a complete stop and make a left turn. (*Id.* at. p. 25, ll. 20-25) Gottfried then saw Alan make a left turn, then a right at the curve where the street turns into Half Moon Bay. (*Id.* at p. 26, ll. 3-8) Gottfried testified that Alan was driving no faster than one would in a residential area, 25 or 30 miles per hour at the most. (*Id.* at p. 26, ll. 10-13) Lenahan testified that Alan's car was going roughly 10 - 15 miles an hour (Ex. D, Lenahan depo. p. 68, ll. 6-19) According to Gottfried, Alan signaled his turns. (Ex. C, Gottfried depo. p. 27, ll. 5-16)

Gottfried had been ordered by a sergeant to drop the pursuit, but he decided to follow Alan on his own without telling anyone that he was still following Alan. (*Id.* at p. 28, ll. 11-22) When Alan turned into the garage, Gottried failed to stop his car in such a way as to block the driveway. (*Id.* at p. 32, ll. 14-19) Gottfried testified that Alan at no time attempted to strike his police vehicle. (*Id.* at

3

p. 33, ll. 21-23)   Earlier, during the chase they almost hit each other at one point, but Gottfried did not know if "[Alan] was specifically trying to do something." (*Id.* at p. 34, ll. 1-5) Gottfried rushed into the garage.  The distance between the Corolla and the car that was parked inside the garage was wider the than the width of Gottfried's body by a couple inches on each side. (*Id.* at p. 39, ll. 1-6)

Gottfried struck the driver's side window of the Corolla, so hard that his hand was stinging or numb for about ten minutes. (*Id.* at p. 40, ll. 8-25) At the time that Gottfried rushed into the garage, he had observed Alan Kosakoff obey traffic laws, driving slowly and arriving at the home where the Corolla was registered.

> Q:   Now when you saw the car pull into the garage, it's fair to say that that car pulled in slowly?
> A:   Yeah, I mean, I didn't - it wasn't a high speed at all, no.
> Q:   It pulled in slowly.  It was not necessary for it to brake suddenly when it got inside the garage that you saw?
> A:   That I saw, no.
> Q:   It parked straight?
> A:   Yes.
>
> Q:   It did not hit anything in the garage that you saw?
> A:   Correct.
> Q:   And am I correct that at some point - if not immediately, but at some point that night you perceived that there was a lot of items in the garage on the side and throughout the garage?
> A:   Correct.
> Q:   They were stored, I believe, on the side and then at the front part of the garage.  Do you remember that?
> A:   Correct.
>
> Q:   And this car was able, nonetheless, to pull in slowly and park straight?
> A:   Correct.
> Q:   And not hit anything that you perceived?
> A:   Correct. (*Id.* at p. 41, l. 3 - p. 42, l. 5)

According to Gottfried, when he tried to pull Alan out of the car, he "kind of turned to the right a little bit" and did not slap Gottfried, scream at him or say anything to him. (*Id.* at p. 47, ll. 6-14) Gottfried knew that one of the reasons why Alan couldn't come out of the car was because he had a seatbelt on, but Gottfried did not try to unbuckle it. (*Id.* at. p. 48, ll. 14-20)  Gottfried opened the car door and placed himself in the doorframe. (*Id.* at p. 49, ll. 19-25) Gottfried was behind the front door

4

of the Corolla until the driver's door cleared the bumper of the parked car. (*Id*. at p. 53, ll. 5-10) Gottfried moved his body out of the area of the front door so that he was no longer at risk of being knocked over by the front door of the Corolla after clearing the rear bumper of the other car parked in the garage. (*Id*. at p. 53, ll. 22 - p. 54, l.3) Defendant Lenahan was behind Gottfried during this time. (*Id*.at p. 68, ll. 3-7)

### D. Physical Evidence

The Defendants claim in their Motion for Summary Judgment that one of more of the officers were behind the Toyota Corolla as it rolled backwards placing a life in danger. They also claim all shots were fired inside the garage. The physical evidence proves this is not so. The evidence shows no one was behind the car or in life threatening danger when the shots were fired. In fact, the evidence establishes the car was outside of the garage and in the driveway when the last five shots were fired. The photographs of the scene were taken by members of the San Diego Police Department and the bullet holes in Alan Kosakoff's car were labeled A, B, C, D, E and F. (See Exhibit E, photographic exhibits from deposition of Marc Firestone).

It is undisputed that Douglas shot five times into the car, hitting Alan once in the thigh. (Exhibit F - Firestone report, §2) It is undisputed that Lenahan shot twice into the driver's side of Alan's Corolla, with one of these shots hitting Alan in the left rear part of the head. Ultimately, after thirty-nine days, Alan Kosakoff died.

### 1. The Shattered Glass from the Driver's Side Window is Only on the Driveway, not in the Garage.

The physical evidence shows that the Corolla was not in the garage when the fatal shot was fired. The driver's side window was shot out by Officer Lenahan, the bullet striking Alan in the head. (*Id.*) Alan backed the Corolla slowly out of the garage into the driveway. The helicopter video shows that it took approximately three (3) seconds for the Corolla to travel the length of the driveway. According to measurements, the speed of the car in reverse was 8.8 feet/second or six (6) miles per hour. (Exhibit F, § 4.1)

All of the broken glass from this shattered window was in the driveway. (*Id.*)(Exhibit E, photograph of the driveway)  It was found approximately eight (8) feet down the driveway away from the garage entrance.(Ex. F § 4.2)  Glass takes approximately a half of a second to fall from the height of four (4) feet (the approximate height of the driver's side window from the ground).  (Ex. F § 4.1)  With the glass beginning to fall immediately upon being shot, it would take five tenths of a second (.5 seconds) to fall to the ground.(Ex. F § 4.1)  With the car moving at six miles per hour, this places the driver's side window just over three and a half (3.6) feet into the driveway and out of the garage at the time of the shot. (Ex. F § 4.2)  Therefore, this fatal shot was not taken while the car was in the garage. (Exhibit F, § 4.1)  The physical evidence shows that the fatal shot occurred when the car was outside of the garage, moving **away** from the defendant police officers.

### 2.  Angles of the Shots and Location of Casings from Lenahan's Weapon Shows that Alan was Driving Away from the Defendant When Lenahan Fired the Fatal Shot.

Officer Lenahan was not inside the open Corolla driver's door when he fired the fatal shot, but was standing in front of the doorway altogether.  Had Lenahan been inside the doorway of the vehicle, he obviously could not have shot through the driver's side window, shattering the glass.  (See Exhibit E)  The angle of the fatal shot required Alan's head to be forward of the headrest and the shooter's (Lenahan) gun to be forward of Alan's head (more west or inside the garage). (Exhibit F §4.2)  This is established by evidence of the wound along with hair and lead fragments found in the back, passenger seat. (*Id.*)  The bullet wound was in the left rear section of Alan's head.  (*Id.*)  This places Lenahan's gun forward, or west, of the driver's door  at the time of the shooting.  (*Id.*)  Additionally, the shot was determined not to be one of close range (within two and a half feet) because of lack of stippling or soot on Alan's body. (*Id.*)

### 3. Douglas' Shots.

The testimony is conflicting as to when each officer's shots were fired, although the evidence supports that Douglas' first two shots were at close range of approximately two (2) feet from the windshield and his three last shots were at a much greater distance. At the slow speed the Corolla was traveling this suggests he shot twice, paused, then shot three more times.

6

Douglas' first two shots, D and E, were fired about two (2) feet from the windshield of the Corolla based on a their sharp downward angle. These shots into the car also came at a horizontal angle, showing they were fired from the passenger side of the Corolla near the front. This places Douglas at about the front right side corner of the vehicle in the northwest corner of the garage for the first two shots.

The next three shots, A, B and C were fired at different angles that establish the Corolla had to have been a significant distance further away from Douglas than the first two shots. Shot B was fired at the vehicle as it was traveling down the driveway from approximately fourteen (14) feet away based on the angle of the entry. This is the shot San Diego Police Department criminalist Loznycky stated caused the transmission fuel leakage. (Ex. G, Loznycky depo p. 76-77, ll. 23-25, 1-2). The driveway is approximately 26.5 feet long (*Id.* at p. 45, ll.18-21). This transmission fuel leakage began in the center of the driveway (*Id.* at p. 44, ll. 17-22), about halfway between the entrance into the garage and the street. Shot C was fired from an even greater distance than shot B. Shot A was low, into the license plate holder. This is an angle evidencing distance from the shooter, and it was fired when the Corolla was approximately seven (7) feet from the opening of the garage based on the location of the broken piece of the plate holder on the driveway.

### III.
### Defendants' Credibility is a Factual Issue in Dispute.

The record would justify a reasonable jury finding that the defendants deliberately misstated the facts to seek to justify what they knew to be an unreasonable case of deadly force. Such a credibility finding would support a reasonable inference that the defendant officers acted, not in self-defense, but out of anger, malice, or a desire to inflict extrajudicial punishment on a person who had refused to yield and had driven recklessly some time before the arrival at the garage. The shooters both testified with certainty to facts contradicted by physical evidence and neutral eye-witnesses.

Douglas testified that when he fired, he was absolutely positive the car was inside the garage (Ex. H, Douglas depo. p. 13 ll. 11-12) while the physical evidence shows that at least three shots occurred while Alan's car was in the driveway. Douglas testified at his deposition:

7

Q:     Let me ask you a question whether in fact when you
       fired one of your shots the Toyota Corolla was rolling
       backwards and was entirely out of the garage.
A:     Never.
Q:     You're sure of that
A:     Yes. (*Id*. at p. 63 ll. 15-21)

Lenahan testified with certainty to things that a reasonable jury could find to be false.

Q:     Are you positive that the car into which you shot was
       inside the garage at the time you shot into it?
A:     Yes sir. (Ex. D, Lenahan depo. p. 114 ll. 7-10)

Q:     It was not in the driveway when you shot?
A:     Yeah, it was not in the driveway. (Ex. D, Lenahan
       depo. p. 114 ll. 23-24)

Q:     Likewise, you're quite sure that all five of the shots
       that Douglas shot occurred while the car was inside
       the garage?
A:     Yes, sir. (Ex. D, Lenahan depo. p. 114 ll. 25 - p. 115,
       l.3)

A reasonable jury could find the claims of Lenahan and Douglas not believable based on contradictions between their declarations with this motion and their deposition testimony. For example, Lenahan swears in his declaration "in light of the driver's reckless conduct, both on the residential streets and the interstate, any civilian in the area would be in grave danger if the suspect drove back into traffic again." (Lenahan declaration ¶35) At his deposition, he swore that his only purpose in shooting was in claim self-defense of himself, Douglas and Gottfried. (Ex. D, Lenahan depo. p. 117 ll. 9-14) Lenahan testified at his deposition:

Q:     You didn't fire because you didn't want the Toyota
       Corolla to get away, right?
A:     It had nothing to do with pursuing the suspect at that
       point.
Q:     It was purely self-defense?
A:     Yes sir. (*Id*. at p. 94 ll. 10-13)

Douglas claims in his declaration that his "concern" included the "attempted escape" of the suspect, who was "hell bent on leaving, regardless of the consequences of his actions" (Douglas declaration ¶18) At his deposition, he testified that he acted only to protect his fellow officers:

8

| | |
|---|---|
| Q: | And your intention was not to prevent the car from pulling out of the area and away from the officers by backing out on the street? |
| A: | No. |
| | |
| Q: | Your reason for firing is because you were engaged in self-defense or the defense of others, correct? |
| A: | Mainly the defense of others; but yes, self defense as well. (Ex. H, Douglas depo. p. 16 ll. 2-10) |
| | |
| Q: | But that was the reason and the only reason that you fired; that is to say, your perception of the threat to their lives? |
| A: | Absolutely. (Ex. H, Douglas depo. p. 64 ll. 15-18) |

The summary judgment motion's claim that Gottfried, Lenahan and Douglas acted, *inter alia,* to defend "those civilians who were at risk in light of decedent's dangerous actions, both at Half Moon Bay Drive, as well as the public streets and highways of San Diego" (Defendants' Memorandum p. 10) is thus at odds with defendants' sworn deposition testimony that they used deadly force for self-defense only, and not to prevent the car from leaving the area. Defendants attempt to justify the use of fatal force by suggesting, *ex post facto,* that the reason for killing Alan included prevention of threat or harm to "innocent motorists." (*Id.* at p. 12) This is a disingenuous attempt to recast the previous testimony of the defendants in light of defendants' current awareness of the evidence which demonstrates the falsity of their earlier assertions about when they shot, where Alan and his car were located, and their claims of using fatal force only because of the need to protect their lives, when in fact they shot Alan at the time when he was pulling away from them and represented no danger.

Defendants attempt to argue their motion under the rubric of "high speed chase" by selectively ignoring the actual facts of this case. The chase was over long before the arrival at the garage; Alan had slowed to 10-15 miles per hour, was signaling his turns and had pulled slowly into the garage of his mother's home. Thus, there was no justification for the use of deadly force.

Given their contradictory assertions, their changing testimony, and their sworn statements that are starkly contradicted by physical evidence, circumstantial evidence, expert testimony, and eye witness accounts, a reasonable jury could plausibly find that these officers rushed the garage because they were angry at decedent's behavior, that they killed him because of their anger at his perceived defiance of authority and that their false statements are deliberate, as opposed to being the result of

misperception or misrecollection. It is appropriate to note that the fourth witness to the events inside the garage is now forever unable to testify, because of the actions of the defendants. Summary judgment is particularly unjustified when credibility determinations are critical to the determination of the truth, and the victim of the homicide cannot give his version of the facts.

### A. Lenahan's Version of Events is Not Possible.

The evidence is clearly contrary to Lenahan's deposition testimony. Lenahan stated that he fired over the top of Gottfried, while both men were pressed closely against each other, within a slightly open doorframe, at about 90 degree angle into the car, as Alan was within his reach, all of this happening inside the garage. (Ex. F §4.2.1) This cannot be true. First, had the shot been taken from inside the doorframe as Lenahan stated, it would be physically impossible for Lenahan's shot to go through the driver side window. (*Id.*) If Lenahan's version is true, there would be no broken glass. (*Id.*)

Second, had the shot been inside the garage, the glass would have been found in the garage or slightly near the opening into the driveway, not eight (8) feet out into the driveway. (Ex. F, § 4.2.2) Third, Gottfried testified he didn't hear the shot or know where Lenahan was at the time of the fatal shooting. (Ex. F. § 4.2.1) Notwithstanding other evidence, this contradicts the two being pressed together within the doorframe during the shot, and contradicts any claim of Gottfried being in danger. It was Gottfried, not Lenahan, who was in the doorframe as the Corolla was slowly backing out of the garage. (Ex.F § 4.2) Gottfried testified that he did not clear the doorframe of the car until the driver door cleared the bumper of the parked Camry.

The evidence of the first shot establishes Lenahan was behind the stationary Camry out of the way of the reversing Corolla because the shot entered the doorframe of the Corolla at a northwestern angle (Ex. F § 4.2). Had Lenahan taken the shot from as close a range as he stated there would have been soot or stippling, yet none was found, so his gun was at least two and a half feet from Alan's head.(*Id.*) Last, with the casing #7 found in the yard outside the garage, Lenahan would have been at the east end of the garage near the entrance to the driveway when he fired this shot. (*Id.*) All of this evidence places Lenahan at the rear of the stationary Camry and not in immediate or life threatening danger.(*Id.*) Lenahan fired at the Corolla twice from his position, once as it began to reverse and was beginning to exit the garage, then he rotated as it moved east and fired again, hitting the driver's

window and Alan Kosakoff in the head, as the driver's window was at least a three and a half feet into the driveway. (Ex. F, § 4.1)

## B.  Douglas' Version of Events is Not Possible.

In his deposition, Douglas testified that he first fired when he was a foot in front of the Corolla slightly to the passenger side of the Corolla. (Ex. F, § 4.3.1)  This is contradicted by the horizontal entry of bullets D and E placing him further out to the side, in the northwest corner of the garage. (*Id.*)  He testified that after his first shots,  Lenahan shot, and then he remained stationary firing three more times. (*Id.*)  For these three shots he estimated the car was two feet away, then three feet away, and four feet away respectively. (*Id.*)  This is inconsistent with the shallow angles of the three shots, the transmission fluid leak in the driveway and the location of the piece of the license plate holder in the driveway. (*Id.*)  Douglas also testified that this second round of three shots were fired in two seconds. (*Id.*)  If his shots were fired within two seconds of the time the Corolla began reversing, the front of the Corolla would be more than nine (9) feet away from where it started. (*Id.*) The evidence indicates Douglas was likely moving forward while shooting as the Corolla was traveling down the driveway out of the garage. (*Id.*)

Douglas' statement that he was directly in front of the Corolla slightly off to the side where he shot twice, paused, and then shot three more times as the car moved about a foot between each shot is refuted by the evidence. The first two shots are at a sharp downward and slightly horizontal angle consistent with close range and the shooter being off to the side of the vehicle. (*Id.*)  The next three shots are at shallow angles, suggesting at least 14 feet from the shooter, one so low that it hit the license frame and knocked a piece off in the driveway 7 feet from the garage. (Ex. F § 4.3) Another struck the engine causing a leak in the transmission fluid that began halfway down the driveway from the garage entrance. (*Id.*)  The evidence of the transmission fluid and frame establish that the car was likely in the driveway for those shots. (Ex. C, Loznycky depo p. 48, ll. 16-22).  The last three shots suggest Douglas had moved forward from his original position at the northwest corner of the garage and shot at the Corolla as it was already out, well into the driveway. (Ex. F, §4.3.1)

The evidence supports a scenario where the officers were in the garage, Douglas at front of the passenger side, and Lenahan and Gottfried between the Camry and Corolla when they entered the garage.  Gottfried testified he attempted to remove Alan from the car, but Alan began reversing. Gottfried and Lenahan then moved out of the space between the cars as Douglas fired his first two shots at close range.  The car still slowly moving, Lenahan was standing slightly behind the Camry when he took his first shot, hitting the doorframe. As the car still moved away from him, he followed it to his right, shooting again as it exited the garage and hit Alan in the head. Douglas followed with his three shots, all while the Corolla was rolling down the driveway to where it finally rested.

## IV

**The Defendants' Conduct was Below the Standard of Care and Objectively Unreasonable.**

Plaintiffs produced testimony from the police procedures expert Roger Clark that the conduct of the defendant officers violated the basic police officer standards and training that every California peace officer receives.  Their conduct violated their training that shooting at a moving vehicle is futile and contrary to professional standards. (Ex. I, p 2)   The officers failed to use safe and reasonable tactics including the use of established protocols which require the officers to remain in a position of safety (cover), and to avoid provoking a needless crisis by rushing Alan Kosakoff to violently extract him from the car. (Ex. I, p.9)   The failure to use basic tactics to permit decompression, to engage in clear communication, to elicit compliance by calm and deliberate actions violated the basic standard of reasonableness required of any trained officer in these circumstances. (Ex. I, pp. 9-10)  The reckless rushing of a mentally disturbed person was unnecessary.  The discharge of weapons in a residential neighborhood killed Alan Kosakoff - but it also endangered the lives of innocent neighbors.  The use of deadly force in these circumstances, in the opinion of Roger Clark, plaintiffs' expert, was in violation of accepted professional standards and was objectively unreasonable. (Ex. I, pp. 1-2)

////

////

////

12

## V.

## Defendants are Not Entitled to Summary Judgment on the Fourth Amendment Claim

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates,* 287 F.3d 846, 853 (9th Cir.2002); *see also Liston v. County of Riverside,* 120 F.3d 965, 976 n. 10 (9th Cir.1997) (as amended) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury."). This is because such cases almost always turn on a jury's credibility determinations. This is the situation with the case before this Court.

Because genuine issues of material fact exist in light of the testimony of percipient witnesses, summary judgment is not appropriate. *Celotex Corp v. Catrett,* 477 U.S. 317 (1986). Nor are the defendants entitled to a dismissal based on qualified immunity. Defendants Lenahan and Douglas used deadly force. Defendant Gottfried was the first to use unnecessary force, and his actions precipitated the actions which caused Alan's death. The law regarding the use of such deadly force has been clear and well established for many years. Under *Tennesse v. Garner*, 471 U.S. 1, 11-12 (1985), police use of deadly force is reasonable only where the officer has probable cause to believe that the suspect poses a threat of serious physical harm either to the officer or to others. Only if the suspect threatens the officer with a weapon or there is probable cause to believe that the suspect has committed a crime involving the infliction of serious physical harm, may deadly force be used if necessary to prevent escape and, where feasible, some warning has been given. (*Garner* at 11-12.)

The reasonableness of the officer's conduct is to be evaluated with careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham v.Connor*, 490 U.S, 386, 396 (1989).

The Ninth Circuit has consistently held that the use of deadly force is only justified if the officer has probable cause to believe that a suspect poses a threat of death or serious physical harm to the officers or others. *See Fikes v. Cleghorn*, 47 F.3d 1011, 1014 (9th Cir. 1995) *See also Vera Cruz v. City of Escondido*, 139 F.3d 659, 663 (9th Cir. 1998). Given the Supreme Court decision in *Tennessee v. Garner* in 1985 and the subsequent Ninth Circuit decisions, it is clear that any reasonable officer would have known that deadly force may only be used in the limited circumstances where probable cause exists that there is a serious threat of death or serious bodily harm presented by the suspect.

"The rule of *Garner* applies whether Plaintiff proves that no danger ever existed **or if he merely proves that any danger had subsided** by the time Defendant fired the third shot." *Tubar v. Clift,* 453 F. Supp. 2d 1252, 1258 (W.D. Wash. 2006)(emphasis added). However, the Supreme Court has noted that, while the general standard of *Garner* is sufficient in 'obvious' cases, additional, more particularized law is necessary in the not-so-obvious cases. *See Brosseau v. Haugen*, 543 U.S. 194, 125 S. Ct. 596 (2004); see also *Anderson v. Creighton*, 483 U.S. 635 (1987). The *Tubar* Court found this distinction relevant only if the jury finds that the first two shots were constitutionally reasonable. Thus, if all three shots were unreasonable, this is an "obvious" case.

> "Further, even if the jury concludes that only the third shot was a constitutional violation, the facts of *Brosseau* are distinguishable from the instant case and do not dictate a finding that the high level of particularity required in *Brosseau* is required here as well. Whereas the suspect in *Brosseau* struggled and resisted arrest and subsequently began to flee in a vehicle, driving in a clearly threatening manner immediately before being shot, the vehicle in the instant case had slowed and turned away from Defendant Clift by the time he fired his third shot. Thus, even if Defendant Clift perceived Ms. Morehouse and Plaintiff to be fleeing, dangerous suspects when he fired the first two shots, a jury could find that they were in no sense 'fleeing' or dangerous when the third shot was fired." *Tubar v. Clift*, 453 F. Supp. 2d 1252, 1258.

*Tubar* is factually similar to the present case. In this case, Alan Kosakoff had slowed the car down and was following all traffic laws and signaling his turns. He was a danger to no one when he slowly pulled into the garage at his mother's home. There was no danger to the defendants or any other bystander when the shots were fired. According to independent eye witnesses and the

physical evidence, Alan Kosakoff was moving away from the defendants when the defendants shot him.

It is true that Mr. Kosakoff may have appeared to be attempting to escape, but under the *Garner* standard, defendants did not have probable cause to believe that Mr. Kosakoff posed a significant threat of death or physical injury. Given the significant materially different versions of the events, defendants are not entitled to summary judgment, especially on the basis of their self-serving and questionable assertions. *See Ting v. United States*, 927 F.2d 1504 (9th Cir. 1991). As the Supreme Court stated in *Garner*:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so...a police officer may not seize an unarmed, non dangerous suspect by shooting him dead... *Garner* at 11-12.

## VI.

### Plaintiffs Object to the Consideration of the Declaration of William Lewinski re Motion for Summary Judgment and Moves to Strike It as Inadmissible.

In support of their motion for summary judgment, defendants have submitted the declaration of William Lewinski. Plaintiffs object to the consideration of this declaration for several reasons. First, there is no evidentiary basis submitted for the Court to make a finding that Lewinski has the competence or qualifications to render an expert opinion regarding this shooting.

There is no showing that Lewinski reviewed or read any of the documents or evidence in this case. He is making a generalized opinion about an "average" police officer and the reaction time.

Further, there is no showing that the declaration is the product of reliable principles or methods, and no showing that the witness has applied the principles and methods reliably to the facts of the case. There is no provision of the facts or data upon which the opinion of the alleged expert is based under Rule 703. In the absence of a showing of record that the subject matter of the testimony is based upon an adequate, scientific basis, with principles that have been subject to scrutiny and

vetting by peers or some other scientific review, the declaration is inadmissible under *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), and its progeny.

## VII.

### Summary Judgment on the Fourteenth Amendment Claim is Inappropriate

Given the disputed material facts in this case, summary judgment should be denied on defendants' motion to dismiss the cause of action based on the Fourteenth Amendment substantive due process liberty interests in familial association.

It is not entirely clear whether the "deliberate indifference" or "shocks the conscience" test applies to the Due Process claim of Mr. And Mrs. Kosakoff based on the loss of their association with their son, Alan. The better rule is that "deliberate indifference" is appropriate. *See Bryd v. Guess* 137 F. 3d 1126, 1134 (9th Cir. 1998)(A family member had to prove deliberate indifference to their rights of familial relationship and society by the use of excessive force.) Other courts have held that a *Smith v. Fontana* 818 F. 2d 1411 (9th Cir. 1987) due process claim is derivative of the Constitutional claim of decedent, and governed by the same legal standard, i.e. Fourth Amendment objective reasonableness.

In the Ninth Circuit, it is well established law that a liberty interest exists in the familial relationship between parent and child. *Curnow By and Through Curnow v. Ridgecrest Police*, (9th Cir. 1991) 952 F.2d 321, 325. In *Curnow*, it holds that while the person who claims excessive force was directed at him or her can only raise a fourth amendment claim, a parent who claims loss of the companionship and society of his or her child, or vice versa, raises a different constitutional claim. The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child, *see Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir.1986); *Kelson v. City of Springfield*, 767 F.2d 651, 653-55 (9th Cir.1985), and that a "child's interest in her relationshipwith a parent is sufficiently weighty by itself to constitute a cognizable liberty interest," *Smith v. City of Fontana*, 818 F.2d 1411, 1419 (9th Cir.), *cert. denied*, 484 U.S. 935, 108 S.Ct. 311, 98

16

L.Ed.2d 269 (1987). Thus, *Graham v. Connor* does not bar the parents' and children's due process claims. In *Curnow* the district court therein recognized these authorities and properly denied defendants/appellants' motion for summary judgment based thereon.

In *Ramirez v. County of San Diego*, 2009 U.S. Dist. LEXIS 32363 (S.D. Cal. Apr. 15, 2009), the district court addressed the exact same argument advanced by the defendants and denied summary judgment to a defendant officer who shot and killed the son of the plaintiff-parents. The *Ramirez* court held that to find the defendant's conduct violated Plaintiffs' constitutional right of familial association under such circumstances, they must prove defendant's use of force was done with a purpose to harm plaintiff's unrelated to legitimate law enforcement objectives. The *Ramirez* Court found that "while an officer generally does not act with a purpose to harm when 'responding to an emergency,' a reasonable factfinder might conclude the officer does intend to harm when he 'creates the very emergency he then resorts to deadly force to resolve…'" *Id* at citing *Bingue v. Prunchak*, 512 F.3d 1169, 1177 (9th Cir. 2008); *Porter*, 546 F.3d at 1141.

The "denial of due process 'is to be tested by an appraisal of the totality of facts in a given case." *Porter*, 546 F.3d at 1141 (quoting *Lewis*, 523 U.S. at 850). The fact-intensive analysis parallels that undertaken to resolve direct Fourth Amendment excessive force claims, and similarly must account for the "delicate balancing act between citizens' rights to be free from undue police force and the legitimate safety concerns of officers who make these life and death decisions." *Id.*

"With regard to the first prong of the *Saucier* test, the court concludes, as discussed above, that while Plaintiffs do have a constitutional right to be free from governmental interference with their relationship with their son, there exist genuine issues of material fact regarding whether Deputy Ritchie's use of force was done with a purpose to harm Ramirez unrelated to legitimate law enforcement objectives. *Curnow*, 952 F.2d at 325; *Porter*, 546 F.3d at 1137; *Lewis*, 523 U.S. at 836." *Ramirez v. County of San Diego*, 2009 U.S. Dist. LEXIS 32363.

Under the second prong of *Saucier*, the question becomes whether this constitutional right, cognizable under § 1983, was clearly established. The *Ramirez* Court found that before July, 2005, there was clear and controlling authority in place that police officers may not use deadly force

indiscriminately to prevent the escape of a felony suspect no matter the circumstances but rather, may only do so if the officer "has probable cause to believe that the suspect poses a risk of serious physical harm, either to the officer or to others…." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Ramirez also found that as of July 2005, the courts had clearly established the right of a decedent's parents to recover for a loss of familial association when an officer unreasonably kills a fleeing suspect under *Curnow,* 952 F.2d at 325.

The Ninth Circuit has observed that in excessive force cases, the inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," "summary judgment…in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). Defendants do not enjoy immunity in this case as the force used was unreasonable.

**VIII.**
**Summary Judgment on the State Causes of Action is Inappropriate**

With respect to the negligence claim, Gottfried, Douglas and Lenahan failed to exercise their duty of care. Gottfried disobeyed a direct order from a supervisor to stop the chase. Gottfried continued to follow Alan Kosakoff while failing to notify others that he was continuing the pursuit. Gottfried now maintains that he was concerned about the safety of other motorists, especially the "young people [who] might be out and about." The chase was called off in the interest of the safety of bystanders. Instead of following orders, Gottfried continued to follow Alan Kosakoff's car.

When Alan arrived at his mother's home, defendants failed to block the driveway of the home which would have prevented Alan from backing out. Instead, the three of them rushed into the tight space of the garage where a Camry was parked on the other side. The defendants failed to communicate with each other. These defendants knew that Alan Kosakoff had just gone home. They knew that the Corolla was registered at the Half Bay Moon address; they saw that Alan was driving under the speed limit and signaling; they saw that Alan opened the garage door with his opener; they saw Alan slowly maneuver his car straight into the garage.

These defendants recklessly ran into the garage and placed themselves directly into a line of

18

fire. Instead of giving clear orders to a suspect, Gottfried immediately ran up to the car, striking the window with his fist and physically struggling with Alan who was strapped in with a seatbelt.

Their conduct throughout, including the use of deadly force, fell below the standard of care expected of reasonable and trained officers. (See Ex. I) The evidence clearly supports the other state causes of actions, and defendants motions should be denied.

## IX.

### Motion to Dismiss

Plaintiffs will move to dismiss Defendant Landsdowne from the complaint. Plaintiffs will move to dismiss The San Diego Police Department as a party, and will move to dismiss the Monell claim for failure to properly screen, hire, train and supervise against the City of San Diego.

## X.

### CONCLUSION

Summary judgment is a drastic remedy and is therefore to be granted cautiously: "Neither do we suggest that the trial courts should act other than with caution in granting summary judgment ... " *Anderson v. Liberty Lobby, Inc.* (1986) 477 US 242, 255. Summary judgment is proper where the dispute is of a type *normally decided by the court* and not a jury. Where, for policy reasons, courts normally draw the ultimate conclusion, the matter is more akin to a "pure" issue of law which may be resolved on summary judgment. *Prinzi v. Keydril Co.* (5th Cir. 1984) 738 F2d 707.

Moreover, it should also be emphasized that in the context of a summary judgment motion, the Ninth Circuit has considered the factual determinations in an excessive force claim to be considerations for a jury to make. "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates,* 287 F.3d 846, 853 (9th Cir.2002); *see also Liston v. County of Riverside,* 120 F.3d 965, 976 n. 10 (9th Cir.1997) (as amended) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the

19

jury."). This is because such cases almost always turn on a jury's credibility determinations.

The *Graham* and *Saucier* tests cannot be met by the defendants' in this case given the state of the relevant material facts. The essential material facts are disputed and can only be resolved by deciding issues of credibility. However, common sense dictates that an imminent threat will be hard to find when a person is backing away from the police officers. The authorities applicable to the analysis clearly support denial of the motion for summary judgment on all grounds, except for Landsdowne, the Police Department as a party, and the Monell claim against the City. Save for these exceptions, defendants motion for summary judgment should be denied.

DATED: April 1, 2010                                    Respectfully submitted,


                                                        /s/Eugene G. Iredale
                                                        EUGENE G. IREDALE
                                                        JULIA YOO
                                                        Attorneys for Plaintiffs
                                                        105 West F St.
                                                        San Diego, CA 92101
                                                        (619) 233-1525