1  JAN I. GOLDSMITH, City Attorney
   DONALD R. WORLEY, Assistant City Attorney
2  DONALD F. SHANAHAN, Chief Deputy City Attorney
   California State Bar No. 49777
3          Office of the City Attorney
           1200 Third Avenue, Suite 1100
4          San Diego, California 92101-4100
           Telephone:  (619) 533-5800
5          Facsimile:   (619) 533-5856

6  Attorneys for Defendants
   City of San Diego, San Diego Police Department,
7  William Lansdowne, Michael Gottfried,
   Brian Lenahan, Benjamin Douglas

8
                    UNITED STATES DISTRICT COURT
9
                  SOUTHERN DISTRICT OF CALIFORNIA
10

11 | ESTATE OF ALAN KOSAKOFF, by its            ) Case No.  08cv1819 IEG (NLS)
   | personal representative HAROLD KOSAKOFF,   )
12 | ARLENE KOSAKOFF, an individual,            ) **DEFENDANTS, CITY OF SAN**
   | HAROLD KOSAKOFF, an individual,            ) **DIEGO, SAN DIEGO POLICE**
13 |                                            ) **DEPARTMENT, WILLIAM**
   |                                            ) **LANSDOWNE, MICHAEL**
14 |              Plaintiffs,                    ) **GOTTFRIED, BRIAN LENAHAN,**
   |                                            ) **AND BENJAMIN DOUGLAS' REPLY**
15 |       v.                                    ) **TO PLAINTIFFS' OPPOSITION TO**
   |                                            ) **MOTION FOR SUMMARY**
16 | CITY OF SAN DIEGO, a municipal              ) **JUDGMENT PURSUANT TO RULE 56**
   | corporation, SAN DIEGO POLICE              ) **OF THE FEDERAL RULES OF CIVIL**
17 | DEPARTMENT, WILLIAM LANSDOWNE,             ) **PROCEDURE**
   | an individual, Officer Gottfried, an individual, )
18 | Officer Lenahan, an individual, Officer Douglas, )
   | an individual, and DOES 1-100 inclusive,   ) Date:    April 26, 2010
19 |                                            ) Time:   10:30 a.m.
   |              Defendants.                    ) Judge:  Irma E. Gonzalez
20 |                                            ) Court Room:  1
   |                                            )
21 | AND RELATED CROSS COMPLAINT                )
   |                                            )

I

**DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
ON PLAINTIFFS' FOURTEENTH AMENDMENT CLAIMS**

Case law in the Ninth Circuit is definitive in excessive force cases under the Fourteenth Amendment when an evolving set of circumstances requires "fast action." The applicable standard which courts must apply under these circumstances is a plaintiff must prove that the defendants acted with a purpose to harm that was unrelated to legitimate law enforcement objectives not the lower standard of deliberate indifference. *County of Sacramento v*. Lewis, 523 U.S. 833, 866 (1998). Where officers have to act quickly, the purpose to harm standard must apply. *Porter v. Osborn*, 546 F.3d 1131, 1140 (9th Cir. 2008).

> In *Lewis*, the Supreme Court recognized that law enforcement officers confront a variety of circumstances that may lead to the use of force, and drew a distinction between situations that evolve in a time frame that permits the officer to deliberate before acting and those that escalate so quickly that the officer must make a snap judgment.

*Porter v. Osborn*, 546 F.3d at 1137 (citing *Lewis*, 523 U.S. at 851).

The deliberate indifference standard requires a meaningful opportunity for actual deliberation. *Porter*, 546 F.3d at 1138. In *Lewis*, the Supreme Court rejected the deliberate indifference standard for high speed chases, even though logically an officer giving chase could deliberate even while accelerating after a suspect. *County of Sacramento v. Lewis*, 523 U.S. at 851 n. 11 (the court did not mean "deliberation" in the narrow technical sense in which it has sometimes been used in traditional homicide law). Because officers often times must act quickly, the courts have not unnecessarily restricted the timeframe for a meaningful opportunity for actual deliberation. In *Lewis*, the chase lasted approximately five minutes; *Porter v. Osborn*, 546 F.3d at 1137 (sixty-seven seconds between the pepper spray and shooting); *MacEachern v. City of Manhattan Beach*, 623 F.Supp.2d 1092, 1100 (C.D.CA 2009)(court applied purpose to harm standard where officer had twenty to twenty-five seconds to decide whether to shoot); *Ramirez v. County of San Diego*, 2009 WL 1010898 (S.D.CA) (foot chase for more than one-tenth of a mile – officer fired twenty two rounds).

1

In the instant matter, four seconds elapsed between the time the last officer entered the garage and the vehicle was observed by the helicopter leaving the garage. *See Exhibit G, pertinent portions of the deposition of Roger Clark*, *p. 67, ll. 10-13*. The decision of Officers Douglas and Lenahan to use their weapons occurred within a two second timeframe. Clearly, the events in the garage occurred quickly, without a meaningful opportunity for the officers to deliberate as to whether they should fire their weapons.

Plaintiffs' reliance on *Ramirez v. County of San Diego* for denying summary judgment is misplaced in denying summary judgment for the defendants. The court refrained from identifying the facts supporting the denial. The facts in *Ramirez* are substantially different than those found in the instant matter. There, the defendant, a Deputy Sheriff, originally fired sixteen rounds, over a distance of one-tenth of a mile, while, according to the defendant, plaintiff was running for his life. The decedent apparently made some movement towards the front of his trousers, but neither fired a weapon or displayed a weapon during the chase. After being hit in the leg, the decedent fell to the ground while defendant reloaded his weapon and fired an additional six times as the decedent lay on his back. Thus, the defendant fired a total of twenty-two (22) shots. The court held, based upon the record, there was a genuine issue of material fact as to whether the use of force was done with a purpose to harm unrelated to law enforcement objectives. In denying the plaintiff's motion, the court relied on *Tennessee v. Gardner*, 471 U.S. 1 (1985), which held police officers may not use deadly force indiscriminately to prevent the escape of a felony suspect no matter what the circumstances, but rather may only do so if the officer has probable cause to believe the suspect poses a risk of serious harm to the officers or others. The implication is, since the officer admitted the suspect was "running for his life" and no weapon was used or displayed over a lengthy chase, a genuine question was raised as to whether the officer was involved in a purpose to harm.

Here, Defendant Douglas fired his weapon resulting in an injury to decedent's leg. When Douglas fired this shot, Gottfried was within the "V" of the door without the ability to remove himself and in grave danger of being run over by the Toyota. Lenahan's fatal shot occurred less than two seconds after the car began to force Gottfried back and off balance. Even under

1    Plaintiffs' version of events, Lenahan would have fired the fatal shot when the driver was one

2    foot in the garage to several feet outside the garage. Thus, the driver's door would have cleared

3    the Camry by as little as one and a half feet at the time the shot was fired (the Camry was two and

4    one-half feet from the end of the car to the garage door).

5         To suggest that either of the wounding shots was fired with the purpose to harm unrelated

6    to a legitimate law enforcement objective is absurd. There is not a scintilla of evidence that the

7    officers wounded the decedent to teach him a lesson or get even for some alleged infraction.

8    *Porter v. Osborn*, 546 F.3d at PAGE, quoting *Davis v. Township of Hillside* (CITE). Rather, the

9    record clearly reflects officers who sincerely felt that their or their fellow officer's life was in

10   danger.

11                                          **II**

12            <u>**THE USE OF FORCE WAS BOTH REASONABLE AND NECESSARY**</u>

13        The Supreme Court has repeatedly stressed the important of resolving immunity questions

14   at the earliest possible stage in litigation. *Scott v. Harris*, 550 U.S. 372, 376 (2007); *Hunter v.*

15   *Bryant*, 502 U.S. 224, 227 (1991). The reasonableness of the officers' actions is properly

16   determined by the court. *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1099

17   (9th Cir. 1999); *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

18            The 'reasonableness' of a particular use of force must be judged
             from the perspective of a reasonable officer on the scene, rather
19           than with 202-20 vision of hindsight. **** The calculus of
             reasonableness must embody allowance for the fact that police
20           officers are often forced to make split-second judgments – in
             circumstances that are tense, uncertain, and rapidly evolving –
21           about the amount of force that is necessary in a particular situation.

22   *Graham v. Connor*, 490 U.S. 386, 395-97 (1989).

23        The inquiry is whether the force that was used was reasonable viewing the facts from the

24   perspective of a reasonable officer on the scene. *Forrester v. City of San Diego*, 25 F.3d 807-08

25   (9th Cir. 1994).

26        In the instant matter, the officers were aware of the events leading up to the shooting,

27   including, the decedent displayed a total disregard for the safety of the general public, running

28   three red lights at speeds up to 60 mph, driving on the Interstate highway at 120 mph, and defying

                                          3

1  two pursuit vehicles and a police helicopter. Moreover, it was clear to the Defendant officers that

2  the decedent was "hell bent on leaving the garage," even though two of the officers were pinned

3  between the two vehicles without an immediate escape route. Faced with the dilemma, the

4  officers had to make a split-second decision under uncertain and rapidly evolving circumstances.

5       The phrase split-second decision is not merely hyperbole in this case. From the time the

6  officers entered the garage and the vehicle was observed leaving the garage was a mere four

7  seconds. (*Exhibit G – Clark Depo, p. 67, ll. 10-13*). Thus, once the car began moving the decision

8  to shoot had to be made instantaneously as any delay could have been deadly. The decedent's

9  criminal behavior leading up to the entry into the garage, as well as his reckless conduct

10  immediately before the shooting, set the stage for the ultimate result. It was the decedent's action

11  which provoked the police reaction. Relative culpability is a factor in determining reasonableness.

12  *Scott v. Harris*, 550 U.S. 372 (2007). Where a suspect poses a threat of serious physical harm,

13  deadly force may be used. *Billington v. Smith*, 292 F.3d 1177, 1184 (9th Cir. 2002); *Smith v. City

14  of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005).

15       The parties agree that a total of seven shots were fired, five (5) by Douglas and two (2) by

16  Lenahan. Only two of the seven shots caused any injury to the defendant. Douglas fired two

17  shots, one of which hit the decedent in the right leg. (*Exhibit F - Firestone Depo, p. 76, ll. 10-25;

18  p. 77, ll. 1-2*).[1] Moreover, Plaintiffs' expert agrees that at the time Douglas fired the shot that his

19  decedent in his leg, the vehicle was in reverse and Gottfried was in the "V" of the door. (*Exhibit F

20  - Firestone Depo, p. 121, ll. 10-23).* Thus, Gottfried was in danger and a reasonable officer would

21  perceive the danger to a fellow officer and be duty bound to act. *Scott v. Henrich*, 39 F.3d 912,

22  913 (9th Cir. 1994)(force reasonable if probable cause to believe suspect poses threat of death or

23  serious injury).

24       The other shot of consequence was the second shot by Lenahan, which hit decedent on the

25  left side of the head.[2] Here, rightly or wrongly, Officer Lenahan believed Gottfried was within the

26

27       [1] This shot was labeled as "E" in the San Diego Police Department Investigation.

28       [2] This shot was labeled as "G" in the San Diego Police Department Investigation.

4

1    "V" of the door and in physical danger. Thus, Lenahan reasonably perceived a threat of death to

2    his fellow officer.

3          According to Plaintiffs' expert, the vehicle was traveling at 8.8 feet per second. (*Exhibit F*

4    *- Firestone Depo, attachment 5, para. 4.1*). Thus, Lenahan had less than one second in which to

5    determine whether he should fire his weapon. Plaintiffs argue because the shot shattered the

6    driver's window and, as a consequence, Lenahan could not have been within the "V" when he

7    fired. Thus, the lethal shot was fired when the officers were not in peril and the threat primarily

8    subsided. However, the record based primarily on Plaintiffs' expert testimony establishes

9    Lenahan reacted instantaneously to the threat. The record reveals that: (1) Gottfried was trapped

10   between the Camry and Corolla and was unable to extradite himself until the driver's door of the

11   Corolla cleared the rear end of the Camry. (*Exhibit D – Pendleton Dec, Attachment A; Exhibit A –*

12   *Gottfried Dec*); (2) the distance between the rear bumper of the Camry and the garage door was

13   two and one-half feet (2 ½)(*Exhibit D – Pendleton Dec*); (3) Plaintiffs' expert placed the driver of

14   the vehicle, at the time of the fatal shot, a foot west or inside the garage up to several feet outside

15   the garage. (*Exhibit F – Firestone Depo, p. 146, ll. 8-15*); (4) the fatal shot was fired primarily

16   north and slightly east 25 degrees or less. (*Exhibit F – Firestone Depo, p. 156, ll. 19-25*).

17         Thus, from the time Gottfried could have escaped from the "V" of the door until the fatal

18   shot was fired, the vehicle traveled one and one-half feet (1 ½) or roughly one-fifth of a second.

19   Moreover, based upon the multiple studies and research conducted by Dr. Lewinsky, Lenahan

20   fired his rounds within one-third of a second (1/3). Therefore, Lenahan had an extremely limited

21   time in which to react. (*Exhibit G – Declaration of William Lewinsky, Ph.D., para. 17*).  The

22   studies also reveal that an officer engaged in a life-threatening situation requires time to make a

23   decision to shoot, align their guns, and pull their trigger and then additional time to detect that the

24   situation had changed and to stop pulling the trigger.  (*Exhibit G – Declaration of William*

25   *Lewinsky, Ph.D., para. 16*). Under lab conditions, officers firing rapidly and knowing they would

26   have to stop, fired an additional two (2) rounds while detecting the signal that indicated they were

27   to stop. In the real world, circumstances where an officer is uncertain about the outcome or when

28   it will stop, the officer is going to have a more difficult time identifying that elements have

5

changed. (*Exhibit G – Declaration of William Lewinsky, Ph.D., para. 19*).  The officers in a life-threatening situation are so focused on the threat that it is difficult for them to immediately determine that they are no longer at risk.

When Lenahan fired, his body position moved ever so slightly. The gun, in the Plaintiffs' expert's opinion, was fired in primarily a northerly, slightly easterly direction. The gun would have moved roughly a foot and one-half (1 ½) to Lenahan's right when he fired his final shot. (*Exhibit G – Declaration of William Lewinsky, Ph.D., para. 25*).  This description is consistent with the time frame and movement dynamics for an officer engaged in multi-tasking (shooting and assessing) to note decedent was becoming less of a threat and then stop shooting. (*Exhibit G – Declaration of William Lewinsky, Ph.D., para. 25*).

**A.      Shattered Glass**

The shattered glass found in the driveway is consistent with the notion that the shot was fired just inside the garage or immediately outside of the garage. Plaintiffs' expert opined that the police department marker marking the glass on the driveway was eight and one-half feet east of the garage door, but also noted glass several feet west of the marker within six and one-half (6 ½) feet of the door. If it took .5 of a second to fall to the ground at 8.8 feet per second and, assuming the glass fell immediately and there was no glass farther to the west, the shot would have hit roughly two feet east of the garage door. Put another way, four and on-half (4 ½) feet from the rear end of the Corolla.

**B.      Shots "B" and "C"**

Shots B and C are for all intensive purposes irrelevant as neither shot caused any injury. Moreover, the results for Shot "B" (transmission fluid) and Shot "C" (portion of the license plate holder) are inconclusive with respect to where the shots were fired from. For instance, there is no way to know if the transmission fluid immediately released to the ground when the shots were fired and, if not, the distance the vehicle could have traversed is impossible to determine. (*Exhibit F – Firestone Depo, p. 106, ll. 15-24*). Nor can one determine when the shot was fired by the location of the license plate holder in the driveway as there is no way to determine if the license

/ / /

6

1  plate holder fell to the ground as soon as the bullet hit the plate. (*Exhibit F – Firestone Depo, p.*

2  *104, ll. 14-22*).

3                                           **III**

4             **ALLEGED DISPUTE OF FACTS NOT RELEVANT TO MOTION**

5          Plaintiffs argue a factual dispute exists as to whether the officers fired their weapons when

6  decedent's vehicle was inside or outside the garage. Again, only two of the shots are at issue.

7  Douglas' Shot "E," which imbedded decedent's right leg and Lenahan's Shot "G," which hit

8  decedent in the side of the head. Douglas was clearly in the garage when he fired Shot "E."

9  (*Exhibit F – Firestone Depo, p. 121, ll. 10-23*; *Exhibit B – Douglas Dec*). Lenahan's shot was

10  also fired within the garage while the vehicle was a foot or so inside the garage itself. This fact is

11  also supported by Plaintiffs' expert. (*Exhibit F – Firestone Depo, p. 146, ll. 8-15*).

12          Plaintiffs also argue that both Gottfried and Lenahan had cleared the Corolla and were no

13  longer in harm's way when Lenahan fired his final shot. The earliest Gottfried could have exited

14  the "V" of the door was only when the Corolla cleared the back end of the Camry. This required

15  Gottfried to maneuver out of the way with only two and one-half feet from the Camry to the

16  garage door. This was occurring while the decedent's vehicle was continuing to move rearward

17  and Lenahan was firing simultaneously. The entire sequence of events from entry into the garage

18  until the vehicle was visible in the drive way totaled four seconds. Thus, the critical events

19  occurred within a few feet and culminated in a blink of an eye.

20          The officers' focal point was on the life threatening events unfolding before them and

21  their effort to stop the threat. The officers were not focused on their exact position when they

22  fired their weapons or whether the driver's door was open or closed. In dealing with these

23  situations, the studies and research performed by Dr. Lewinsky are informative. The studies show

24  the ability to accurately describe those facts not directly within their focus is limited.

25          For instance: "Regardless of the stress level of an event on a person, an important

26  principle in perception and memory is that generally we cannot notice and then remember

27  something that we are not paying attention to, even if it is directly in front of us.  It is also very

28  / / /

                                             7

1    difficult to simultaneously pay equal attention to two or more important items at the same time."

2    (*Exhibit G – Declaration of William Lewinsky, Ph.D., para. 21*).

3        "We can of course shift our attention back and forth between two important items but for

4    that brief period of shifting attention we are unable to accurately note what occurred in the

5    target(s) on which we were not focused." (*Exhibit G – Declaration of William Lewinsky, Ph.D.,*

6    *para. 22*). "This is especially true when we are preoccupied, and even more so when it is also a

7    rapidly unfolding, dynamic and/or a life threatening encounter of short duration." (*Exhibit G –*

8    *Declaration of William Lewinsky, Ph.D., para. 22*). "Therefore, it is a normal part of human

9    behavior for officers in this type of situation, to have a limited perception and then recall, about

10    anything else except that on which they are directly and intently focused." (*Exhibit G –*

11    *Declaration of William Lewinsky, Ph.D., para. 23*).  "In these types of circumstances, officers

12    also, often cannot report on the exact number of rounds they had fired or the presence or position

13    of other officers or sometimes even their own position and movement." (*Exhibit G – Declaration*

14    *of William Lewinsky, Ph.D., para. 23*). "These are most consistent, as reported by the officers in

15    this incident, with examples of human perceptual and cognitive processing problems in this type

16    of encounter and not consistent with intentional acts to deceive." (*Exhibit G – Declaration of*

17    *William Lewinsky, Ph.D., para. 24*).

18        The extreme rapidness of these unfolding events and Lenahan's reasonable perception of

19    the threat offers no suggestion that Defendants committed a constitutional violation. The force

20    use was reasonable viewed from the perspective of a reasonable officer at the scene. *Forrester v.*

21    *City of San Diego*, 25 F.3d 807-08 (9th Cir. 1994).  Thus, the fact that the officers' testimony

22    may, in some instances, be inconsistent with one another cannot be ascribed to a lack of

23    credibility.

24        A material issue of fact must relate to the issue at hand not merely any factual dispute.

25    "Qualified immunity is 'an *immunity from suit* rather than a mere defense to liability."  *Mitchell v.*

26    *Forsyth*, 472 U.S. 511, 526 (1985)(emphasis in original); *Saucier v. Katz*, 533 U.S. 194, 202

27    (2001)(holding that "deny[ing] summary judgment any time a material issue of fact remains on [a

28    § 1983 claim] could undermine the goal of qualified immunity to 'avoid excessive disruption of

1  government and permit the resolution of many insubstantial claims on summary judgment.'"

2  (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

3  **IV**

4  **PLAINTIFF CANNOT ESTABLISH THE LAW WAS CLEARLY**
**ESTABLISHED UNDER THESE FACTS**

5

6  Under the *Saucier* analysis regarding qualified immunity, if the Court finds that there was

7  a constitutional violation, it must then determine "whether the officers could nevertheless have

8  reasonably but mistakenly believed that his or her conduct did not violate a clearly established

9  constitutional right." *Saucier*, 533 U.S. at 201-05.

10  If "it would be clear to a reasonable officer that his conduct was unlawful in the situation

11  he confronted," then qualified immunity does not apply. *Saucier*, 533 U.S. at 202. But, if

12  "officers of reasonable competence could disagree on th[e] issue, immunity should be

13  recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In Saucier, the Court made clear that

14  whether a constitutional violation occurred is separate than whether the right was clearly

15  established. To be clearly established, "the contours of the right must be sufficiently clear that a

16  reasonable official would understand that what he is doing violates that right." *Lindsey v. City of*

17  *Orrick*, 491 F.3d 892, 902 (8th Cir. 2007). Even if an officer's belief that there was a need to

18  utilize force was a mistaken one, the officer's qualified immunity defense prevails "if a

19  reasonable officer possessing the same information could have believed that his conduct was

20  lawful." *Reed v. District of Columbia*, 474 F. Supp. 2d 163, 173 (D.D.C,2007) (citing *District of*

21  *Columbia v. Evans*, 644 A.2d 1008, 1016 (D.C. Cir. 1994)). "It is important to emphasize that this

22  inquiry 'must be undertaken in light of the specific context of the case, not as a broad general

23  proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The key distinction between

24  whether a constitutional violation occurred and whether that right was clearly established is that

25  the right violated must "be defined at the appropriate level of specificity before a court can

26  determine whether it was clearly established." *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir.

27  2005) (citing *Saucier*, 533 U.S. at 202).

28  / / /

9

Here, given the immediate threat of death or serious bodily injury coupled with the extremely limited time frame (less than one second), it defies common sense to suggest a reasonable police officer could not have believed his actions were constitutional. This is especially so when viewed in light of the litany of cases set forth in Defendants' Opening Brief at Section A (3), "The Fourth Amendment Excessive Force Claim," allowing for an officer to shoot at a vehicle being used as a weapon.

*Tular v. Clift*, 433 F.Supp.2d 1252 (W.D.Wash 2006) cited by Plaintiffs is inopposite. There, the police officer was never in danger of bodily injury and therefore, as a matter of law, all of the shots were unreasonable and excessive. The court also found the vehicle had decelerated to 6 mph and defendant Clift was not in danger as to the third shot as he had ample time to simply step to the side and the car.

The courts are uniform in respecting the real concerns of officers for their and their fellow officer's safety. In deciding qualified immunity, the court must never allow the theoretical, sanitized world of its imagination to replace the dangerous and complex world that policeman face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than someone analyzing the question at leisure. *Smith v. Freeland*, 954 F.2d 343, 347 (6th Cir. 1992).

Dated:  April 12, 2010                    JAN I. GOLDSMITH, City Attorney


By    */s/ Donald F. Shanahan*
          Donald F. Shanahan
          Chief Deputy City Attorney

Attorneys for Defendants
City of San Diego, San Diego Police Department, William Lansdowne, Michael Gottfried, Brian Lenahan, Benjamin Douglas