# EXHIBIT G

JAN I. GOLDSMITH, City Attorney
DONALD R. WORLEY, Assistant City Attorney
DONALD F. SHANAHAN, Chief Deputy City Attorney
California State Bar No. 49777
    Office of the City Attorney
    1200 Third Avenue, Suite 1100
    San Diego, California 92101-4100
    Telephone: (619) 533-5800
    Facsimile: (619) 533-5856

Attorneys for Defendants
City of San Diego, San Diego Police Department,
William Lansdowne, Michael Gottfried,
Brian Lenahan, Benjamin Douglas

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF ALAN KOSAKOFF by it's personal representative HAROLD KOSAKOFF ARLENE KOSAKOFF, an individual HAROLD KOSAKOFF, an individual<br><br>    Plaintiffs,<br><br>v.<br><br>CITY OF SAN DIEGO, a municipal corporation, SAN DIEGO POLICE DEPARTMENT, WILLIAM LANSDOWNE, an individual, Officer Lenahan an individiual, Officer Douglas, an individual, and DOES 1-100 inclusive.<br><br>    Defendants. | Case No. 08cv 1819 IEG (NLS)<br><br>DECLARATION OF WILLIAM J. LEWINSKI, Ph.D. IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE |
| AND RELATED CROSS COMPLAINT | |

I, William J. Lewinski, Ph.D., hereby declare as follows:

    1.    I am over the age of 18, have personal knowledge of, and am competent to testify to the matters stated herein.

    2.    In 1981, I began my tenure at Minnesota State University at Mankato as an assistant professor. I was promoted to associate professor in 1986, and became a full

1

professor in about 2003. I have served as Chair of the Department of Political Science and/or Director of the Law Enforcement program for 6 years. Minnesota State University is a fully accredited four-year state university with undergraduate, graduate and doctoral programs.

3. My department has 17 faculty members and serves about 850 students, including undergraduate and graduate students in law enforcement, political science, paralegal studies, and public administration.

4. From 1987 through 1992, I served as director of a law enforcement program at Minnesota State University, Mankato, which is recognized as having the largest and highest-standing law enforcement/criminal justice degree program in the North Central U.S. I developed an applied research/consultation institute at Mankato State University and an integrated clinical program resulting in a four-year law enforcement degree and police officer licensure program in Minnesota.

5. Since 2003, I have been the executive director of the Force Science Research Center and the Force Science Institute, where I have focused my efforts on research relating to the behavioral science aspects of police officer shootings and the analysis of human perception, memory, reaction time, trigger pull and movement time, and other factors related to human performance in circumstances involving high stress that police officers often face. I am one of the leading researcher into human performance in lethal force encounters, and as such I have examined hundreds of officer-involved shootings in minute detail in the U.S., Canada and the United Kingdom. I have interviewed, advised, or counseled over 1,200 officers who have been involved in lethal force encounters.

6. We have just completed a research project directed by us but also involving and utilizing equipment from the University of Calgary. This research involves identifying the eye movement patterns and time sequence patterns of the elite counter terrorism team from the Police Services of Northern Ireland while they are engaged in a simulated gunfight and comparing elite performance to less than elite. We also just finished advising on a research project that arose directly from our last research project in London, England, on attentional processes in a gunfight and collaborated on this project with three Universities from the United Kingdom and also Florida International

University. We ran over 300 firearms officers from the U.K. through this project in January of 09. We are also engaged in an extension of our subject movement analysis involving movement and firing with a handgun from a prone position on the ground. This is in collaboration with the University of Indiana's ergonomics lab and Northeast Wisconsin Technical College. We are also currently collecting data on one of our own research projects that involves the time required to detect a change within a visual field, shift attention and then react to that change. This project was developed in collaboration with professors in our Psychology Department and our Department of Electrical and Computer Engineering. In summary, our previous and current research focuses on subject and officer movement in lethal force encounters, as well as action/reaction parameters (including movement, shooting time and judgment time), perception, and memory. This is *precisely* the issue presented by this case, and I am well qualified to express opinions on the subject.

7. I have extensively published my research findings in many publications, including the peer reviewed *Journal for the Association of Crime Scene Reconstruction*, the *Law Enforcement Executive Forum*, and *Police Quarterly,* among others. I am editor and a major contributor to a twice-monthly newsletter on my areas of research interest. The publication is distributed to approximately three quarters of a million subscribers and is occasionally featured on the password protected website of the International Association of Chiefs of Police and also disseminated throughout their departments by many law enforcement agencies, including The Federal Law Enforcement Training Academy in Glencoe Georgia which trains 70,000 law enforcement officers per year.

8. I have published research in scholarly, peer-reviewed journals and presented at peer-reviewed conferences for law enforcement professionals and educators. Our research has appeared and been approved to appear at peer-reviewed conferences for national and international engineering associations, the Academy of Criminal Justice Sciences and the American Psychological Association..

9. I have been invited to present my work to select sub-committees of the House of Commons and House of Lords in the United Kingdom. I routinely spend one-two weeks per month in the United Kingdom conducting research projects. Two years ago I was invited to be the keynote speaker at the Police Psychological Services Section

of the International Association of Chiefs of Police. The previous year they convened a special panel (including myself) to examine the implications from our research on their policy recommendations.

10. I am a frequent lecturer at professional and law enforcement seminars on the topics described above, and others. A listing of my presentations is included in my attached resume.

11. In summary, I am a full-time professor at Minnesota State with the majority of my time dedicated to conducting, publishing, and presenting my research in the subject areas outlined above.

12. I have reviewed the following materials:
   a. Claims against the City
   b. Complaint against the City
   c. San Diego Police Department Homicide Investigation File
   d. Declaration of Bruce Pendleton
   e. Deposition of Brian Lenahan
   f. Deposition of Michael Gottfried
   g. Deposition of Benjamin Douglas
   h. Deposition of Marc Firestone
   i. Deposition of Roger Clark
   j. Consultation with Mr. Dan Tonek

13. It is known that after an officer is involved in a shooting, we can't "open up" the officers head and look in but there are centuries of scientific study on human behavior, including perception, processing time, action and reaction time and even decision making processes and time that can inform us about human behavior in real world circumstances including officer involved shootings. We can then use that information to help us understand at least some of the elements of the incident. It is not analyzing the officer's mind and it is not informing us about what the officer thought -- it is simply using centuries of scientific research on human performance to inform us about some of the behavioral aspects of the incident. This is not an unusual process as it has been done for decades in accident reconstruction. For instance if an officer is simply driving a car, receives a cell phone call and glances down to see who is calling on their

4

cell phone and then looks up, we know from a large number of studies how long that action would generally take. If we then also knew what speed they were traveling at we could determine how far they had traveled while they were not focused on their driving and what they would not be able to see because they were focused on their cell phone.

14. Similarly there are almost two centuries of research on human behavior that have application to officer-involved shootings. Trainers, investigators, administrators and jurists throughout most of the western world are applying at least some element of this research. Most of the research is generally done on average human beings. Some has been done by the military. Some has been done with law enforcement. Force Science Institute, Ltd. and the Force Science Research Center have done considerable research on our own that stands on this extensive body of research and helps us apply many principles that derive from centuries of research. This research can then be applied to a rapidly evolving, high stress encounter such a police shooting. Knowledge of this research is not "mind reading" or psychoanalyzing an officer. It simply explains the behavioral foundation of an officer's performance in a high stress encounter and has the potential to help anyone trying to understand or judge an officer's behavior, "frame of mind" during a shooting incident, as well as the dynamics of the physical interaction between the subject and the officer.

15. An officer's response, in particular their perception of threat, their subsequent attempt to save their life or that of others and then the ceasing of that attempt when they see there is no longer any danger, are all framed within the perceptual, processing and reaction limits of a human being, a well-trained law enforcement officer, but nonetheless a human being.

16. It is obvious but worthy to note that all thought and action take time. Even the decision to start shooting and the actual completion of the trigger pull take time. Reactive behavior of all kind takes time. Therefore, for example such as in this instance, it took time for Officers Douglas and Lenahan to make a decision to shoot, align their guns and pull theirs trigger and then it also took time to detect that the situation had changed and to stop pulling the trigger. During that action by the officers, movements involving direction, distance and speed can and were simultaneously being done by Mr. Kosakoff and his vehicle, the Toyota Corolla.

17. Also, the average officer firing a short stroke, light poundage, semi-automatic handgun, such as the ones used here, can fire at the rate of a quarter of a second per shot. If we were to start timing at the first shot, they then can fire five rounds within a second. A relatively slow time for a rapid trigger pull on these types of handguns would be a third of a second per shot. We have no reason to believe that Officers Lenahan and Douglas are not average officers. Therefore when Officer Douglas reports that he fired the last three rounds quickly and as a group, research and his report lead us to conclude that the last three rounds were fired in a total of half a second and certainly no more than two-thirds of a second. Officer Lenahan would be able to fire his Sig Sauer in the same time frame. Therefore the two rounds that he fired likely were fired with a third of a second in between them. To state it differently, he likely fired both shots within a third of a second.

18. We know from Officer Douglas' statement that he perceived that Officer Lenahan had finished firing his two rounds just before he (Officer Douglas) re-engaged with his last three. From the ballistic evidence it is apparent that the front of Mr. Kosakoff's vehicle had not cleared the traffic officer and Officer Lenahan when Officer Douglas had decided to re-engage. His time to re-engage and then fire his three rounds would take approximately three quarters to nine-tenths of a second in this type of circumstance. That means he would have finished firing his three rounds about the time the front end of Mr. Kosakoff's vehicle was at the plane of the garage door.

19. The level of threat and the officer's attentional focus to engage that threat also informs us about the ability of that officer to stop their action. In our research on time to start and stop shooting, conducted under ideal laboratory conditions, the officers, firing rapidly and knowing that they would have to instantly stop, fired an additional two rounds while detecting the signal that indicated they were to stop and they then completed the action of stopping. (This research is available on the Force Science website under articles.) There are several renditions but the simplest version is entitled the "Tempe Study." In our research the stimulus to stop was expected by the officers and was very simply and clearly presented. In a dynamic, real world circumstance where an officer is uncertain about the behavior, the outcome, or when it will stop, that officer is going to have a much more difficult time identifying that elements have changed. This is

6

generally more relevant for someone who is standing in front of a vehicle that is moving away from them than an officer who is positioned by the side of the vehicle. The position by the side of the vehicle leads to a clearer perception of the travel distance of the vehicle and this profile view should lead to a clearer perception of change and then a quicker reaction to stop shooting.

20. Therefore, the stimulus to stop shooting, in this incident, was a visual confirmation by Officers Douglas and Lenahan that the vehicle was no longer presenting a lethal threat. Officer Douglas, from his position in front of the vehicle, in particular does not get a chance to observe, note and then react to the change of the path of this vehicle (away from the officers) and stop shooting, until the Toyota Carolla driven by Mr. Kosakoff is a visually detectable distance past Officers Lenahan and Gottfried. That appears to have been when the front of the Corolla was at the plane of the garage door.

21. Regardless of the stress level of an event on a person, an important principle in perception and memory is that generally we cannot notice and then remember something that we are not paying attention to, even if it is directly in front of us. It is also very difficult to simultaneously pay equal attention to two or more important items at the same time. We can hold a soft focus on several items or activities at the same time, but once we intently focus on something, we then loose the ability to attend to and report as accurately on anything else that is occurring simultaneously. The numerous studies on driving and cell phone use or texting use is an example of this "human" problem that is currently a focus of interest in the public domain.

22. We can of course shift our attention back and forth between two important items but for that brief period of shifting attention we are unable to accurately note what occurred in the target(s) on which we were not focused. Therefore, it is normal to remember only a limited amount of information about any event – regardless of how important that event is or will become. This is especially true when we are preoccupied, and even more so when it is also a rapidly unfolding, dynamic and/or a life threatening encounter of short duration.

23. Therefore, it is a normal part of human behavior for officers in this type of situation, to have a limited perception and then recall, about anything else except that on which they are directly and intently focused. For example, Officer Gottfried did not

know that Officer Lenahan fired his service weapon, even though Officer Lenahan was right beside him when he was firing his gun. In these types of circumstances, officers also, often cannot report on the exact number of rounds they had fired or the presence or position of other officers or sometimes even their own position and movement. In our own studies, officers could not report their location in relation to physical elements such as doors and posts, during their brief shooting encounter, unless they were focused on using these before or during the shooting or it was important for them to note their location after they had finished shooting. These are classical examples of the limitation of human perception and performance by professionals operating under life threatening conditions such as were present in this incident. Therefore when Officer Douglas informs us about the position he was in at the time when he was focused on attempting to stop Mr. Kosakoff from driving into his fellow officers we know that his effort is likely his best attempt to provide an answer and he is not necessarily providing an independently confirmable, factual location. Similarly with Officer Lenahan's report on his own position or rather his lack of ability to precisely locate his position in reference to the opening of the garage door during the shooting component of this incident.

24. Further, in these types of circumstances, humans who are responding as rapidly as they can to save their life or someone else's cannot simultaneously critically analyze the information they are processing and some of their actions and also ruminate or reflect on the behavioral options open to them. Because all of their attentional resources are focused on pushing forward their trained responses they have little time and few cognitive resources left for review and reflection. For instance, Officer Douglas feels the Toyota Corolla against his leg and immediately interprets the pressure as a forward motion, although objectively the Corolla likely did not move forward. Also, Officer Gottfried hit the driver's side window with his right hand. He slightly injured his right hand while doing this, but he could not remember why he did that. He later said it was maybe to get Mr. Kosakoff's attention. These are most consistent, as reported by the officers in this incident, with examples of human perceptual and cognitive processing problems in this type of encounter and not consistent with intentional acts to deceive.

25. Officer Lenahan apparently turned twenty-two degrees to his right and rear, while he was engaged in shooting to stop Mr. Kosakoff. If we consider Officer

Lenahan's position to be his focal point, if he was facing directly toward the opposite wall of the garage, his rotation to his right, at that point, of twenty-two degrees means that from an arm-extended shooting position, his body is going to turn slightly. His gun is only going to move approximately a foot and a half to his right before he fired his last shot, while detecting that Mr. Kosakoff was becoming less of a threat. Given the speed with which this incident unfolded, this is consistent with the time frame and movement dynamics for an officer engaged in multi-tasking (shooting and assessing) to note that Mr. Kosakoff was becoming less of a threat and to then stop shooting.

*I declare under penalty of perjury, under the laws of the State of California that the forgoing is true and correct.*

Executed on this 6th day of February 2010, at Shannon, Ireland.

WILLIAM JOSEPH LEWINSKI, Declarant