# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF ALAN KOSAKOFF, by its personal representative Harold Kosakoff; ARLENE KOSAKOFF, an individual; and HAROLD KOSAKOFF, an individual,<br><br>  Plaintiffs,<br><br>vs.<br><br>CITY OF SAN DIEGO, a municipal corporation; SAN DIEGO POLICE DEPARTMENT; WILLIAM LANDSDOWNE, an individual; OFFICER GOTTFRIED, an individual; OFFICER LENAHAN, an individual; OFFICER DOUGLAS, an individual; and DOES 1-100, inclusive,<br><br>  Defendants. | CASE NO. 08-CV-1819 - IEG (NLS)<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT<br><br>[Doc. No. 46] |

In this Section 1983 action, Plaintiffs Harold and Arlene Kosakoff, individually and on behalf of their son's estate, seek to recover for the deadly shooting of Alan Kosakoff by the City of San Diego police officers. Currently before the Court is Defendants' Motion for Summary Judgment. Having considered the parties' arguments, and for the reasons set forth below, the Court **GRANTS IN PART and DENIES IN PART** the motion.

///

///

**BACKGROUND**

I.      **Factual background**

At the time of his death, decedent Alan Kosakoff was a thirty-five year old son of Arlene and Harold Kosakoff. While at college, Alan was diagnosed with paranoid schizophrenia. The condition remained with him throughout his life, although it was treatable with medication and varied in effect. However, starting approximately one year prior to the incident resulting in his death, Alan began to refuse to take the medication for his condition.

On August 25, 2007, shortly after midnight, Alan was driving in a Toyota Corolla that was registered to his mother, Plaintiff Arlene Kosakoff. According to Officer Gottfried, Alan ran a red light across six lanes of traffic on El Camino Real at approximately 60 mph, almost colliding with Gottfried. Gottfried began to pursue the vehicle and caught up to it as it sped through a flashing red light at Del Mar Heights Road. At this time Gottfried activated his overhead lights and siren, and began to initiate a traffic stop. Instead of stopping, Alan allegedly sped away, running through a third red light. The chase continued through a residential area at speeds exceeding 50 mph, with Alan allegedly taking corners in such a manner that caused the tires to screech. At one point, Alan also slammed on his brakes, almost causing Gottfried to collide with his vehicle. Gottfried, however, was not sure whether this maneuver was done intentionally or for any specific purpose. The chase continued to I-5 and then I-805 at speeds up to 120 mph. At this time, a helicopter and a second police unit with Officers Lenahan and Douglas joined in the pursuit. Also at this time Officer Gottfried received information that the vehicle was owned by a middle-aged female and that the owner resided at 14122 Half Moon Bay Drive.

At some point during the chase orders were issued to discontinue the pursuit. Units slowed their speed and turned off their lights and sirens. Alan also reduced his speed and pulled off the freeway. From then on, Alan proceeded to his mother's residence at 14122 Half Moon Bay Drive, driving below the posted speed limit, using his turn signals, and coming to a complete stop at a red light. Even though the pursuit has been called off, Officer Gottfried followed Alan through the residential area to his mother's residence.

When Alan arrived at his mother's residence, he opened the garage using his remote control

and drove into it. Although the garage had another car (Toyota Camry) parked on the left side and a lot of items on the side and throughout the garage, Alan was able to park the Corolla straight. Officer Gottfried testified at his deposition that the distance left between the Corolla and the Camry was wider than the width of Gottfried's body by a couple of inches.

It appears the two police units arrived at the residence immediately after Alan started pulling into the garage. The officers parked their cars on the street, without blocking the driveway, and ran towards the garage. Officer Lenahan was able to grab the closing garage door and force it back up. He then positioned himself to the rear driver's side of the Corolla. Officer Douglas positioned himself at the front passenger side corner of the vehicle. Officer Gottfried went to the driver's side of the car and smacked the window with an open hand, yelling at Alan to turn the engine off and to get out of the car. As one of the eyewitnesses testified, however, with all of the commotion going on and the officers yelling over each other, it was hard to make out exactly what they were saying.

Officer Gottfried then proceeded to open the driver's side door and tried to physically pull Alan from the vehicle. However, because Alan "kind of turned to the right a little bit" and because he was still wearing his seatbelt, Gottfried was not able to pull him out. At this time Alan put the car in reverse and started to back out of the garage very slowly. The speed of the car in reverse was approximately 8.8 feet/second, or about 6 mph. Officer Gottfried alleges that at this point he found himself trapped in the "V" of the open door and the body of the Camry parked to their left and felt that he might be run over. Officers Lenahan and Douglas also believed that Gottfried was in danger of being run over. However, once the Corolla cleared the rear bumper of the Camry, it is undisputed that Gottfried was able to extricate himself from that position. The helicopter video established that from the time the officers entered the garage until the Corolla exited, approximately four seconds had expired. It took the car another three seconds to travel the length of the driveway.

At some point during those seven seconds the officers opened fire. Officer Douglas fired five times, hitting Alan once in the thigh, while Officer Lenahan fired two shots, including the shot to the rear part of Alan's head that proved to be fatal. Although there is some dispute as to the order of the shots, it appears Douglas fired two shots from a close range of approximately two feet, arguably when the car was still stationary, then Lenahan fired his two shots, and then Douglas fired his remaining

three shots. According to Plaintiffs' expert, the fatal shot from Lenahan came through the driver's side door window, shattering the glass. This places Lenahan in front, or west, of the Corolla. All of the broken glass fell onto the driveway, which is consistent with the fatal shot occurring *after* the Corolla passed Lenahan's position at the rear corner of the Camry, such that Lenahan had to swing to his right to track the moving car. According to Plaintiffs' expert, with 0.5 seconds that it takes for the glass to fall from a height of four feet, this places the Corolla approximately three and a half feet outside of the garage, and moving away from the officers, when the fatal shot shattered the car door window. Likewise, the shallow angles of the last three shots fired by Douglas suggest that they were also made when the car was already outside of the garage and moving away from the officers. The first of these shots was low, into the license plate holder, and was fired when the Corolla was approximately seven feet from the opening of the garage. The second shot was fired when the car was approximately fourteen feet away and, according to San Diego Police Department criminalist, caused the transmission fluid leak. The evidence shows the transmission fuel leakage began in the center of the driveway.

After the shots were fired, the Corolla proceeded to roll backwards and then turned sharply to the south, hitting a parked car and coming to a stop. The officers immediately removed Alan from the vehicle in order to administer first aid. Alan was transported to Scripps La Jolla Hospital Trauma Department, and died thirty-nine days later from his wounds.

**II.     Procedural background**

Harold Kosakoff, on behalf of Alan Kosakoff's estate, and Arlene and Harold Kosakoff in their individual capacities filed the present lawsuit on October 6, 2008. The suit names as Defendants officers Gottfried, Douglas, and Lenahan, as well as the City of San Diego, San Diego Police Department, and Chief of Police William Landsdowne. The suit alleges four causes of action pursuant to 42 U.S.C. § 1983: (1) right of association; (2) wrongful death; (3) excessive force; and (4) failure to properly screen, hire, train, supervise, and discipline. It also alleges four state-law claims: (5) wrongful death; (6) battery; (7) intentional infliction of emotional distress; and (8) negligence. Defendants answered on December 3, 2008, and subsequently filed a counterclaim against Arlene Kosakoff on April 2, 2009. In their counterclaim, Defendants allege three causes of action: (1)

1  indemnity; (2) negligence; and (3) negligent entrustment. Arlene Kosakoff filed a Motion to Dismiss
2  with respect to the counterclaim, which the Court denied. Plaintiffs then answered the counterclaim.
3       Currently before the Court is Defendants' Motion for Summary Judgment on the following
4  issues: (1) Officers Gottfried, Lenahan, and Douglas are entitled to qualified immunity with respect
5  to Plaintiffs' excessive force and familial association claims; (2) the fourth cause of action for failure
6  to properly screen, hire, train, supervise, and discipline is without basis; (3) the San Diego Police
7  Department is not a proper defendant; (4) the individual officers are entitled to immunity against the
8  state law wrongful death cause of action; and (5) Plaintiffs cannot prove the necessary elements to
9  sustain a cause of action for negligence. Plaintiffs filed an opposition and evidentiary objections, and
10 Defendants filed a reply and evidentiary objections. The Court heard oral argument on April 26, 2010.

## LEGAL STANDARD

12   Summary judgment is proper where the pleadings and materials demonstrate "there is no
13 genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."
14 FED. R. CIV. P. 56(c)(2); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A material issue of fact
15 is a question a trier of fact must answer to determine the rights of the parties under the applicable
16 substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if
17 the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.
18 "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences
19 from the facts are jury functions, not those of a judge." Id. at 255.

20   The moving party bears "the initial responsibility of informing the district court of the basis
21 for its motion." Celotex, 477 U.S. at 323. To satisfy this burden, the movant must demonstrate that
22 no genuine issue of material fact exists for trial. Id. at 322. Where the moving party does not have the
23 ultimate burden of persuasion at trial, it may carry its initial burden of production in one of two ways:
24 "The moving party may produce evidence negating an essential element of the nonmoving party's
25 case, or, after suitable discovery, the moving party may show that the nonmoving party does not have
26 enough evidence of an essential element of its claim or defense to carry its ultimate burden of
27 persuasion at trial." Nissan Fire & Marine Ins. Co., v. Fritz Cos., 210 F.3d 1099, 1106 (9th Cir. 2000).
28 To withstand a motion for summary judgment, the non-movant must then show that there are genuine

1 factual issues which can only be resolved by the trier of fact. Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 738 (9th Cir. 2000). The non-moving party may not rely on the pleadings alone, but must present specific facts creating a genuine issue of material fact through affidavits, depositions, or answers to interrogatories. FED. R. CIV. P. 56(e); Celotex, 477 U.S. at 324.

The court must review the record as a whole and draw all reasonable inferences in favor of the non-moving party. Hernandez v. Spacelabs Med. Inc., 343 F.3d 1107, 1112 (9th Cir. 2003). To avoid summary judgment, the non-moving party need not produce evidence in a form that would necessarily be admissible at trial. Celotex, 477 U.S. at 324. However, unsupported conjecture or conclusory statements are insufficient to defeat summary judgment. See Hernandez, 343 F.3d at 1112; Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1103 (9th Cir. 2008).

**DISCUSSION**

**I.     Evidentiary objections**

Both parties filed evidentiary objections. Plaintiffs object to the Declaration of William Lewinski on a number of grounds pursuant to Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). However, having reviewed Lewinski's Declaration and the amended Declaration submitted with Defendants' Reply, the Court **OVERRULES** this objection because both declarations set forth sufficient information to be proper and admissible under Daubert. As for Defendants, they object to the Statements of Sean Seaman and Gregory Mathy that were taken by Plaintiffs' investigator on the ground that they are not properly authenticated and that they consist of inadmissible hearsay. However, to avoid summary judgment, the non-moving party need not produce evidence in a form that would necessarily be admissible at trial. Celotex, 477 U.S. at 324. In this case, because the statements objected to are set forth "in question and answer form" and were given under oath, the Court finds that they amount to "the substantial equivalent of an affidavit" and **OVERRULES** Defendants' objections. See Curnow v. Ridgecrest Police, 952 F.2d 321, 324 (9th Cir. 1991) (citation omitted).

**II.    Qualified immunity**

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (citations

1  omitted). The privilege balances two important interests: "the need to hold public officials accountable
2  when they exercise power irresponsibly and the need to shield officials from harassment, distraction,
3  and liability when they perform their duties reasonably." Pearson v. Callahan, — U.S. —, 129 S. Ct.
4  808, 815 (2009). Because it is "'an entitlement not to stand trial or face the other burdens of
5  litigation,'" the Supreme Court repeatedly has "'stressed the importance of resolving immunity
6  questions at the earliest possible stage in litigation.'" Saucier v. Katz, 533 F.3d 194, 200-01 (2001)
7  (citations omitted). "The protection of qualified immunity applies regardless of whether the
8  government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed
9  questions of law and fact.'" Pearson, 129 S. Ct. at 815 (citations omitted).

10  In Saucier, the Supreme Court set forth a two-step inquiry for qualified immunity cases. First,
11  a court must decide whether the facts that a plaintiff has alleged make out a violation of a
12  constitutional right. Saucier, 533 F.3d at 201. Second, if a constitutional violation is present, the court
13  must next determine whether the right at issue was "clearly established" at the time of defendant's
14  alleged misconduct. Id. Thus, "[q]ualified immunity is applicable unless the official's conduct violated
15  a clearly established constitutional right." Pearson, 129 S. Ct. at 816 (citation omitted). In Pearson,
16  the Supreme Court concluded that, "while the sequence set forth [in Saucier] is often appropriate, it
17  should no longer be regarded as mandatory." Id. at 818. Thus, "[t]he judges of the district courts and
18  the courts of appeals should be permitted to exercise their sound discretion in deciding which of the
19  two prongs of the qualified immunity analysis should be addressed first in light of the circumstances
20  in the particular case at hand." Id.

21      A.    Excessive force claim (on behalf of Alan Kosakoff's estate)

22          *i.    Violation of a constitutional right*

23  "Claims of excessive and deadly force are analyzed under the Fourth Amendment's
24  reasonableness standard." Long v. City & County of Honolulu, 511 F.3d 901, 906 (9th Cir. 2007)
25  (citing Graham v. Connor, 490 U.S. 386, 395 (1989), and Tennessee v. Garner, 471 U.S. 1, 7 (1985)).
26  The court must determine whether the shooting at issue was "objectively reasonable" in light of the
27  facts and circumstances confronting the officers, which must be judged "from the perspective of a
28  reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at

1   396-97 (citations omitted). In determining the reasonableness of the force used, careful attention must
2   be given "to the facts and circumstances of each particular case, including the severity of the crime
3   at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and
4   whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396 (citing Garner,
5   471 U.S. at 8-9). The court must balance "the nature and quality of the intrusion on the individual's
6   Fourth Amendment interests" against "the countervailing governmental interests at stake." Id. (citing
7   Garner, 471 U.S. at 8) (internal quotation marks omitted).

8   In the present case, taking Plaintiffs' allegations as true, the force used was not objectively
9   reasonable. The "nature and quality of the intrusion" in this case is extremely high because deadly
10  force is not like any other force. See Garner, 471 U.S. at 9 ("The intrusiveness of a seizure by means
11  of deadly force is unmatched."). The use of deadly force not only intrudes on the suspect's
12  "fundamental interest in his own life," but it also "frustrates the interest of the individual, and of
13  society, in judicial determination of guilt and punishment." Id. Balanced against this is the
14  government's interest in effective law enforcement. Striking a balance between these two conflicting
15  interests, the Supreme Court has held that the use of deadly force is reasonable only if "the officer has
16  probable cause to believe that the suspect poses a significant threat of death or serious physical injury
17  to the officer or others." Garner, 471 U.S. at 3; accord Long, 511 F.3d at 906; Scott v. Henrich, 39
18  F.3d 912, 914 (9th Cir. 1994). Here, although Alan led the officers on a high speed chase for over 15
19  miles, by the time he drove up to his mother's residence he was driving below the posted speed limit
20  and obeying all the traffic laws. By this time, orders were also given to discontinue the pursuit. When
21  the officers ran into the garage where the Corolla stopped, Alan did not attempt to physically resist
22  nor did he engage in any verbal confrontation with the officers; rather, he shifted the car in reverse
23  and started to slowly back out of the garage. As one of the eyewitnesses stated, the car was moving
24  so slowly that at first it did not appear as though it was moving at all. Moreover, taking Plaintiffs'
25  allegations as true, the fatal shot by Officer Lenahan and the last three shots by Officer Douglas were
26  fired after the Corolla exited the garage and was moving *away* from the officers, and after Officer
27  Gottfried extricated himself from the "V" created by the car door. Based on these facts, a jury could
28  find that by this time a reasonable officer would not have had probable cause to believe that Alan

1 posed any significant threat of death or serious physical injury to the officers or others.

2 Defendants' arguments to the contrary are not persuasive. The officers argue their use of deadly force was objectively reasonable because: (1) Alan had and was in the process of committing a felony; (2) he was an immediate threat to the safety of the officers; and (3) he was clearly resisting and attempting to evade arrest by flight. However, as Plaintiffs point out, there are factual disputes and inconsistencies as to each of these that preclude summary judgment. For example, Plaintiffs argue the fact that Alan was engaged in a high speed chase did not make him a threat to others when he has already slowed down, was obeying all the traffic laws, the pursuit had been called off, and there was no indication that it would resume. There is also inconsistency between the officers' depositions, where they claimed that self-defense or defense of Officer Gottfried was their only motivation for firing at Alan, and their present declarations, where they also assert safety of others. Moreover, if Plaintiffs' expert is to be believed, at the moment Alan was shot there was no longer any threat to the officers because Alan was already backing *away* from the officers, and Officer Gottfried had already freed himself from the "V" created by the car door. Finally, there is a dispute as to whether Alan was resisting the officers when he failed to immediately get out of the car, and whether he intended to flee when he put the Corolla in reverse and started to slowly back out of the garage.[1]

Because the balancing in excessive force cases "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002) (citation omitted); accord

---

[1] In addition, Plaintiffs argue the officers' action were objectively unreasonable because the officers violated basic police officer standards and training by: (1) failing to follow the protocol about remaining in the position of safety once they arrived at the residence; (2) provoking a needless crisis by trying to violently extract Alan from the car, instead of giving him time to decompress; (3) failing to communicate clearly and to determine whether the suspect was intoxicated or suffering from any mental disorder; and (4) shooting at a moving vehicle, even though they knew that to be futile and contrary to professional standards. However, the Ninth Circuit has clearly held that a plaintiff cannot avoid summary judgment "by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless." Billington v. Smith, 292 F.3d 1177, 1189 (9th Cir. 2002); accord Reynolds v. County of San Diego, 84 F.3d 1162, 1170 (9th Cir. 1996) ("The fact that an expert disagrees with an officer's actions does not render the officer's actions unreasonable."), overruled on other grounds by Acri v. Varian Assocs., Inc., 114 F.3d 999 (9th Cir. 1997) (en banc). Nonetheless, the Court can consider this as an additional factor under the totality of the circumstances approach governing these cases. See Graham, 490 U.S. at 396.

1  Wilkins v. City of Oakland, 350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to
2  qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the
3  non-moving party, summary judgment is not appropriate."); see also Saucier, 533 U.S. at 216
4  (Ginsburg, J., concurring) ("Of course, if an excessive force claim turns on which of two conflicting
5  stories best captures what happened on the street, Graham will not permit summary judgment in favor
6  of the defendant official."). Thus, while it is true that police officers "'are often forced to make
7  split-second judgments,'" it is equally true that "even where some force is justified, the amount
8  actually used may be excessive." Santos, 287 F.3d at 853 (citations omitted) (emphasis added). In the
9  present case, taking Plaintiffs' allegations as true, the use of deadly force was not objectively
10 reasonable against a non-violent individual, even if he was trying to escape. See, e.g., Garner, 471
11 U.S. at 11 ("It is not better that all felony suspects die than that they escape. Where the suspect poses
12 no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend
13 him does not justify the use of deadly force to do so.").

14 On the other hand, because Officer Gottfried never fired a gun at Alan, the Court agrees with
15 Defendants that he cannot be liable for the use of excessive force. "Liability under section 1983 arises
16 only upon a showing of personal participation by the defendant." Taylor v. List, 880 F.2d 1040, 1045
17 (9th Cir. 1989) (citation omitted); accord Jones v. Williams, 297 F.3d 930, 936 (9th Cir. 2002)
18 (concluding that liability under Section 1983 cannot be premised "merely for being present at the
19 scene of an alleged unlawful act"). Because Plaintiffs have failed to show otherwise, the Court
20 **GRANTS** summary judgment on the Section 1983 claims as to Officer Gottfried.

21        *ii.    Clearly established*

22 Even if a constitutional violation is shown, the plaintiff still "'bears the burden of proving that
23 the rights [he] claims were "clearly established" at the time of the alleged violation.'" Robinson v.
24 York, 566 F.3d 817, 826 (9th Cir. 2009) (quoting Moran v. State of Wash., 147 F.3d 839, 844 (9th Cir.
25 1998)). The pertinent inquiry is "whether it would be clear to a reasonable officer that his conduct was
26 unlawful in the situation he confronted." Saucier, 533 U.S. at 202 (citation omitted). "If the law did
27 not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on
28 qualified immunity is appropriate." Id. (citation omitted).

As early as 1996, the Ninth Circuit noted that "the law governing when an officer may use deadly force against an unarmed fleeing suspect was clearly established." Acosta v. City & County of S.F., 83 F.3d 1143, 1147 (9th Cir. 1996) (citations omitted). "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." Garner, 471 U.S. at 11. Thus, in Acosta, the Ninth Circuit held that an officer "shooting at the driver of a slow-moving car" was not entitled to qualified immunity where "a reasonable officer . . . would have recognized that he could avoid being injured . . . by simply stepping to the side." 83 F.3d at 1146-47. Likewise, in Deorle v. Rutherford, the Ninth Circuit concluded that it was clearly established that it is objectively unreasonable to shoot–even with lead shot wrapped in a cloth–"an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals." 272 F.3d 1272, 1285-86 (9th Cir. 2001).

In the present case, all of the above factors are satisfied. Taking Plaintiffs' allegations as true, when the officers shot at Alan: (1) he was not armed;[2] (2) the only offense he committed was failing to stop and evading the police; (3) he was suffering from a mental disorder, which could have been recognized had the officers followed the standard police procedures and protocol; (4) there was no warning given that the officers would shoot if Alan did not comply with their orders; and (5) Alan did not present an objectively reasonable threat to the safety of the officers or others. On these facts, a constitutional violation was clearly established. See id.; Acosta, 83 F.3d at 1146-47.

Defendants, however, point to Saucier, where the Supreme Court noted that in not-so-obvious

---

[2] Defendants argue Alan *was* "armed" in a sense that he was driving his car in a dangerous fashion. See, e.g., Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002) (concluding that the car had become "a deadly weapon" with which the decedent was armed where he, among other things, drove through someone's front yard at 50-60 mph and passed by their house, and almost hit an elderly motorist head-on when he was driving on the wrong side of the road); Smith v. Freland, 954 F.2d 343, 348 (6th Cir. 1992) (noting that "a car can be a deadly weapon" where the suspect led the police on a high-speed chase and then used his car to hit a police officer's car). However, as the Ninth Circuit has emphasized, while "[t]here is no question that an automobile *can* inflict deadly force," the proper inquiry is whether it could reasonably be perceived as such at the moment of the shooting. See Acosta, 83 F.3d at 1146 n.9. In the present case, a jury could reasonably conclude that when Alan was shot, the car did *not* pose any threat to the officers or to others, and thus was not a "deadly weapon." See id. (concluding that the car was not the type of threat that justified the use of deadly force where it was moving very slowly and the officer "could avoid being injured . . . by simply stepping to the side").

cases, a more particularized approach is necessary. According to the Supreme Court,

> [T]here is no doubt that Graham v. Connor, supra, clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet that is not enough. Rather, we emphasized in Anderson [v. Creighton] "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." 483 U.S. [635, 640 (1987)]. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

Sauicer, 533 U.S. at 201-02; accord Wilson v. Layne, 526 U.S. 603, 615 (1999) ("However, as we explained in Anderson, the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." (citing Anderson, 483 U.S. at 641)). The Supreme Court recently reaffirmed this in Brosseau v. Haugen, 543 U.S. 194, 201 (2004) (per curiam), when it reversed the Ninth Circuit's denial of qualified immunity in a shooting case. In Brosseau, a police officer shot the suspect when the suspect struggled and resisted arrest and subsequently began to flee in a vehicle, driving in a clearly threatening manner immediately before being shot. Id. at 196-97. By finding that the actions of the police officer fell in the "hazy border between excessive and acceptable force," the Supreme Court concluded that the law on those particular facts was not "clearly established." Id. at 201 (citing Saucier, 533 U.S. at 206). Nonetheless, and fatal to Defendants' arguments, the Supreme Court reaffirmed that in an "obvious" case, general propositions such as those from Graham, 490 U.S. 386, and Garner, 471 U.S. 1, "can 'clearly establish' the answer, even without a body of relevant case law." Id. at 199 (citations omitted).

In the present case, taking Plaintiffs' allegations as true, this appears to be an "obvious" case governed by the general principles of Graham and Garner. As previously noted: (1) there was no indication that Alan was armed, (2) he was not physically resisting arrest and was not verbally confrontational with the officers, (3) there is a dispute as to what verbal commands were given to him by the officers and whether those commands could be heard over all the commotion, (4) his car was slowly backing out of his mother's garage and *away* from the officers, and (5) there was no reason to believe that he any longer posed danger to the officers or anyone else. On these facts, a violation of the Fourth Amendment would be "clearly established." See Garner, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing

1  to apprehend him does not justify the use of deadly force to do so."); Adams v. Speers, 473 F.3d 989,
2  994 (9th Cir. 2007) (concluding that the case was "obvious" and that qualified immunity did not apply
3  where there was an absence of a warning and lack of danger to the police officer and others when the
4  police officer shot and killed the suspect after a car chase); see also Tubar v. Clift, 453 F. Supp. 2d
5  1252, 1258 (W.D. Wash. 2006) ("The rule of Garner applies [where] Plaintiff proves that no danger
6  ever existed or if he merely proves that any danger had subsided by the time Defendant Clift fired the
7  third shot. . . .  Thus, even if Defendant Clift perceived Ms. Morehouse and Plaintiff to be fleeing,
8  dangerous suspects when he fired the first two shots, a jury could find that they were in no sense
9  'fleeing' or dangerous when the third shot was fired.").

10              *iii.   Conclusion*
11  For the foregoing reasons, with respect to the excessive force claim brought on behalf of Alan
12  Kosakoff's estate, the Court **DENIES** summary judgment on the basis of qualified immunity as to
13  Officers Douglas and Lenahan, and **GRANTS** summary judgment as to Officer Gottfried.

14         B.     Right of association claim (on behalf of Plaintiffs Arlene and Harold Kosakoff)
15              *i.   Violation of a constitutional right*
16  Plaintiffs Arlene and Harold Kosakoff separately allege that the officers' excessive use of force
17  deprived them of familial association with their son. This interest is protected by the substantive due
18  process clause of the Fourteenth Amendment. Curnow, 952 F.2d at 325. However, only official
19  conduct that "shocks the conscience" is cognizable as a due process violation. County of Sacramento
20  v. Lewis, 523 U.S. 833, 846 (1998) (citing Rochin v. California, 342 U.S. 165, 172-73 (1952)). The
21  Ninth Circuit treats the "shocks the conscience" test as one involving a spectrum between a "deliberate
22  indifference" standard and a "purpose to harm" standard. See  Porter v. Osborn, 546 F.3d 1131, 1137
23  (9th Cir. 2008) (citing Lewis, 523 U.S. at 836). "[T]he critical question in determining the appropriate
24  standard of culpability is whether the circumstances allowed the state actors time to fully consider the
25  potential consequences of their conduct." Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365,
26  373 (9th Cir. 1998) (citations omitted); see also Lewis, 523 U.S. at 850 (noting that "[d]eliberate
27  indifference that shocks in one environment may not be so patently egregious in another").
28  ///

1    In Lewis, the Supreme Court held that, in the context of a high-speed chase, an officer could not be liable for a due process violation without a "purpose to harm." 523 U.S. at 836. Focusing on the fact that police officers often are required to "act decisively" and make decisions "in haste, under pressure, and frequently without the luxury of a second chance," the Supreme Court explained:

> [W]hen unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates "the large concerns of the governors and the governed." Just as a purpose to cause harm is needed for Eighth Amendment liability in a riot case, so it ought to be needed for due process liability in a pursuit case.

Id. at 853-54 (internal citation omitted). In so holding, the Supreme Court relied primarily on Whitley v. Albers, 475 U.S. 312 (1986), an Eighth Amendment prison riot case involving a guard who intentionally shot a prisoner to disperse the rioters. In Whitley, the Supreme Court concluded that in the context of a prison riot, which "indisputably poses significant risks to the safety of inmates and prison staff," liability should turn on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." 475 U.S. at 320-21 (citation omitted).

The Ninth Circuit subsequently expanded on Lewis by first refusing to differentiate between "emergency" and "non-emergency" high-speed chases, see Bingue v. Prunchak, 512 F.3d 1169, 1177 (9th Cir. 2008), and then holding that the "purpose to harm" standard applied even where there was no high-speed chase and the police were only faced with an individual who, after being pepper-sprayed, refused to get out of the car but instead started to drive his car at the officers. See Porter, 546 F.3d at 1139-40. Nonetheless, in both of those cases, the Ninth Circuit was clear in that the higher standard of culpability applied because the officers were faced with a "rapidly escalating nature of the confrontation." See id. at 1139 ("Placed along this spectrum, we are compelled to conclude that the purpose to harm standard must apply here. Osborn faced an evolving set of circumstances that took place over a short time period necessitating 'fast action' and presenting 'obligations that tend to tug against each other.'" (quoting Lewis, 523 U.S. at 853)); Bingue, 512 F.3d at 1176 ("An officer attempting to apprehend a suspect fleeing at high speed does not have the luxury of delay; there is no time for reflection and precious little time for deliberation concerning either the decision to join the chase in the first place or the serial decisions about how best to pursue the suspect. The sheer velocity

of a high-speed chase necessarily converts each situation into a genuine 'emergency.'").

The present case, however, is unlike Lewis, Bingue, or Porter. Contrary to Defendants' arguments, this is not a case where events escalated suddenly or over a period of a few minutes. Rather, accepting Plaintiffs' allegations as true, the situation was steadily *de-escalating* up to the moment of the shooting. Although the Court cannot ignore that Alan led the police on a high-speed and dangerous car chase, the Court also cannot ignore that at some point that chase was called off, the officers slowed down and turned off their lights, and Alan slowed down as well. From that point on, and for the next 15 minutes, Alan proceeded to his mother's residence by driving below the posted speed limit, using his turn signals, and coming to a complete stop at a red light. Looking at the totality of the circumstances, a reasonable jury can conclude that the situation was gradually de-escalating and that, upon arrival at the Kosakoff's residence, the officers could have proceeded to stabilize the situation without any unnecessary use of force. Thus, on these facts, a jury can reasonably conclude that the de-escalating nature of the situation gave the officers sufficient opportunity to "actual[ly] deliberat[e]" on their course of conduct. See Lewis, 523 U.S. at 851. Notably, this is not a case where the excessive use of force occurred *during* the high-speed chase[3] or where a dangerous situation required the police to act quickly to protect the lives of innocent bystanders.[4] Nor is this a case where the whole incident from start to finish spanned only several minutes and was quickly escalating.[5]

Accordingly, the Court agrees with Plaintiffs that the applicable standard should be that of "deliberate indifference." See, e.g., Ewolski v. City of Brunswick, 287 F.3d 492, 511 (6th Cir. 2002) (applying "deliberate indifference" standard of review to a police stand-off, even though "police officers conducting the standoff undoubtedly faced competing obligations and intense pressures in making their decisions"). Under this standard, a plaintiff must demonstrate that the officers

---

[3] See, e.g., Lewis, 523 U.S. 833 (motorcycle passenger killed during a high-speed police chase of the motorcyclist); Bingue, 512 F.3d 1169 (driver and passenger were injured when their car was struck by a police vehicle engaged in a high-speed chase of another vehicle).

[4] See, e.g., Whitley, 475 U.S. 312 (bystander inmate injured when the police were responding to a prison riot involving a hostage situation); Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365 (9th Cir. 365) (man killed during a police shoot-out when police had to act quickly to protect 50-100 people caught in a crossfire).

[5] See, e.g., Porter, 546 F.3d 1131 (motorist shot and killed by an officer during a "suspicious vehicle" investigation that lasted only 5 minutes and was quickly escalating).

1  "'consciously disregard[ed]' a substantial risk of serious harm." See Farmer v. Brennan, 511 U.S. 825,
2  839 (1994) (citation omitted). The officers cannot be liable unless they were both "aware of facts from
3  which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also
4  draw the inference." See id. at 837. That being said, "[w]hether [the officers] had the requisite
5  knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways,
6  including inference from circumstantial evidence, and a factfinder may conclude that [the officers]
7  knew of a substantial risk from the very fact that the risk was obvious." Id. at 842 (citations omitted).

8  In the present case, the "deliberate indifference" standard is easily met. As previously noted,
9  accepting Plaintiffs' allegations as true, a jury could reasonably find that the officers acted
10 unreasonably when they disregarded the order to discontinue the chase and then used deadly force
11 against Alan. Moreover, although a violation of police procedures does not amount to a constitutional
12 violation, a jury could draw a reasonable inference that the officers were deliberately indifferent to
13 Alan's rights when they disregarded police procedures and protocol in storming Kosakoff's garage
14 immediately upon Alan's arrival at his mother's residence. Under these circumstances, the factfinder
15 could conclude that "a substantial risk of serious harm" would have been obvious, and that the officers
16 recognized that risk but nonetheless proceeded with their course of conduct, which ultimately resulted
17 in the use of excessive force against Alan and led to his death. See id. Accordingly, a jury could
18 reasonably conclude that Plaintiffs' Fourteenth Amendment rights were violated.[6]

19 ///

---

[6] The Court notes that even if the more stringent "purpose to harm" standard is applicable, a jury could nevertheless draw a reasonable inference from the totality of the circumstances that it is met in this case. For Plaintiffs to succeed on that theory, they must show that the officers' purpose in shooting Alan was "to cause harm unrelated to the legitimate object of arrest." See Lewis, 523 U.S. at 836.  More specifically, "'it is the intent to inflict force beyond that which is required by a legitimate law enforcement objective that "shocks the conscience" and gives rise to liability under § 1983.'" Porter, 546 F.3d at 1140 (quoting Davis v. Township of Hillside, 190 F.3d 167, 172 (3d Cir. 1999) (McKee, J., concurring)). In Porter, the Ninth Circuit indicated that a "purpose to harm" may be established by evidence of: (1) an intention to "'induce . . . lawlessness, or to terrorize, cause harm, or kill,'" or (2) force being used against a suspect "to teach him a lesson" or to "get even." 546 F.3d at 1140-41 (citations omitted). In the present case, a jury could reasonably conclude that the officers wanted to "get even" with Alan from the fact that: (1) they continued to pursue him even after the chase was officially called off; (2) they disregarded the police procedures and protocol when they stormed the garage where he parked his car; (3) the first thing Officer Gottfried did upon reaching the car was hit the driver's side window with his hand; and (4) the officers later allegedly "deliberately misstated the facts" in order to justify what they knew to be an unreasonable case of deadly force.

*ii.     Clearly established*

Likewise, the Court has no trouble concluding that the applicable law in this area was clearly established at the time of the alleged violation. As already noted, this appears to be an "obvious" case governed by the general principles of Graham, 490 U.S. 386, and Garner, 471 U.S. 1. Accordingly, by August 2007, the law was clearly established that an officer may not use deadly force against an unarmed fleeing suspect where the suspect does not pose an immediate threat to the officer or others. See, e.g., Garner, 471 U.S. at 11; Deorle, 272 F.3d at 1285-86; Acosta, 83 F.3d at 1147. Likewise, the law was clearly established that the parents of a decedent can recover under the substantive due process prong of the Fourteenth Amendment for a loss of familial association when an officer unreasonably kills a fleeing suspect. See, e.g., Curnow, 952 F.2d at 325. Finally, by August 2007, it was also clearly established that a due process violation exists where the police officer's conduct "shocks the conscience."[7] See, e.g., Lewis, 523 U.S. at 846; Moreland, 159 F.3d at 372.

*iii.     Conclusion*

Accordingly, with respect to the familial association claim brought by Plaintiffs Arlene and Harold Kosakoff, the Court **DENIES** summary judgment on the basis of qualified immunity as to Officers Douglas and Lenahan, and **GRANTS** summary judgment as to Officer Gottfried.

**III.     State-law claims**

A.     Immunity

Defendants next argue they are entitled to immunity on the state-law claims. Section 820.2 of the California Government Code provides immunity to peace officers against state-law claims for their discretionary acts in arrest situations.[8] See Price v. County of San Diego, 990 F. Supp. 1230, 1244 (S.D. Cal. 1998); Reynolds v. County of San Diego, 858 F. Supp. 1064, 1074-75 (S.D. Cal. 1994), aff'd in part & rev'd in part on other grounds, 84 F.3d 1162 (9th Cir. 1996). However, Section 820.2

---

[7] Because in the present case a jury could reasonably find Defendants liable under *either* the "deliberate indifference" or the "purpose to harm" standard, the Court need not decide whether each individual standard was clearly established at the time of the alleged violation. It suffices to note that the general applicable standard that a due process violation exists where the official's conduct "shocks the conscience" was clearly established at that time. See Lewis, 523 U.S. at 846.

[8] Section 820.2 provides: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."

1 does not confer immunity if an officer uses unreasonable force. See Price, 990 F. Supp. at 1244; Scruggs v. Haynes, 252 Cal. App. 2d 256, 266 (1967). As discussed above, taking Plaintiffs' allegations as true, a jury could conclude that the use of deadly force in the present case was objectively unreasonable. Accordingly, the Court finds that Defendants are not entitled to immunity pursuant to Section 820.2 and **DENIES** summary judgment on this issue.

### B. Negligence claim

Defendants also argue they are entitled to summary judgment on Plaintiffs' negligence claim because Plaintiffs cannot prove the necessary elements to sustain that claim. To prevail on their negligence claim, Plaintiffs must show that the officers acted unreasonably and that the unreasonable behavior harmed Alan. See Price, 990 F. Supp. at 1245. Because a jury could conclude that the use of deadly force in the present case was objectively unreasonable, the Court **DENIES** summary judgment with respect to the negligence claim as well.

## IV. Remaining causes of action and Defendants

Finally, Defendants also seek: (1) summary judgment on Plaintiffs' claim for failure to properly screen, hire, train, supervise, and discipline because it is improper under Monell v. Dep't of Social Servs., 436 U.S. 658 (1978); and (2) dismissal of Defendant San Diego Police Department. Plaintiffs do not oppose the dismissal of their Monell claim, and also indicate that they will move to dismiss Defendants Landsdowne and San Diego Police Department from the complaint. Accordingly, the Court **DENIES AS MOOT** Defendants' motion for summary judgment in this regard and **ORDERS** Plaintiffs to file a motion to dismiss with respect to their Monell claim and Defendants Landsdowne and San Diego Police Department **within one week** after the filing of this Order. If Plaintiffs fail to file the requisite motion to dismiss, the Court will grant as unopposed Defendants' motion for summary judgment in this regard.

## CONCLUSION

Accordingly, the Court **GRANTS** Defendants' motion for summary judgment as it relates to Plaintiffs' first, second, and third causes of action against Officer Gottfried. In all other respects, the Court **DENIES** summary judgment. The Court also **ORDERS** Plaintiffs to file a motion to dismiss with respect to their Monell claim and Defendants Landsdowne and San Diego Police Department

1 **within one week** after the filing of this Order. If Plaintiffs fail to file the requisite motion to dismiss, the Court will grant as unopposed Defendants' motion for summary judgment in this regard.

**IT IS SO ORDERED.**

DATED: April 29, 2010

_____
IRMA E. GONZALEZ, Chief Judge
United States District Court